**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **JABARI LEON DOTSON,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:24-cv-01864-LLA** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

<u>**DEFENDANTS' OPPOSITION TO**</u>
<u>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

LEGAL STANDARD ......................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

    I.      Dotson Is Unlikely to Succeed on the Merits. ...................................................... 5

          A.     Dotson Lacks Standing Because He Is Ineligible for Registration
                 Regardless of the Weapons Offense Bar. ..................................................... 5

          B.     Dotson Is Unlikely to Succeed on His Second Amendment Claim............ 9

                1.     The Weapons Offense Bar Is Consistent With the Scope of
                      the Second Amendment. ................................................................. 10

                      a.     The Second Amendment Extends Only to Non-
                             Dangerous, Law-Abiding Individuals............................... 10

                      b.     The Weapons Offense Bar Ensures That Individuals
                             Who Present a Risk of Danger and Are Not Law-
                             Abiding Do Not Access Guns........................................... 13

                      c.     There Is No Rule That Non-Violent Weapons-
                             Offense Misdemeanants Cannot Be Disarmed. ................ 15

                      d.     Dotson Fails to Identify Any Other Characteristics
                             That Make Him Non-Dangerous and Law-Abiding
                             Despite His Conviction. .................................................... 20

                2.     The Weapons Offense Bar Is Consistent With Historical
                        Principles.......................................................................... 23

                      a.     The Historical Record Establishes That the
                             Government May Disarm Individuals Who Pose a
                             Danger or Violate Legal Norms, Including Through
                             Criminal Disqualifiers, Class-Based Laws, and
                             Licensing.......................................................................... 23

                      b.     The Weapons Offense Bar Is Relevantly Similar to
                             Historical Precursors........................................................ 27

II.   Dotson Will Not Suffer Imminent, Irreparable Harm Absent Relief.................. 32

    A.   Allegations of Constitutional Violations Do Not Automatically
        Establish Irreparable Harm. ................................................................ 32

    B.   Under the Correct Standard, Dotson Fails to Show Irreparable
        Harm. ................................................................................................ 34

III.  The Balance of Harms and Public Interest Alone Support Denying an
    Injunction. ................................................................................................ 36

    A.   The Public Has Strong Interests in Popular Sovereignty, Safety,
        and Government Efficacy. ................................................................. 37

    B.   The Public Interest Outweighs One Plaintiff's Allegations of
        Injury. ............................................................................................... 39

IV.   The Court Should Not Enter a Final Judgment.................................................... 42

CONCLUSION .................................................................................................................. 43

# INTRODUCTION

Precedent, history, and common sense all point to the same principle: the government can keep guns out of the hands of those who have misused guns before.  In line with that principle, the District of Columbia (District) screens prospective gun owners and carriers through a registration system and denies registration to individuals previously convicted of weapons offenses.  This weapons offense bar has protected the District's residents and communities for nearly 50 years.  But one weapons offender, Plaintiff Jabari Leon Dotson, has suddenly decided that the bar violates the Second Amendment.  Not only that, but he also asks the Court to enjoin the bar—both preliminarily and permanently—on a short fuse and thin record.  Mem. of P. & A. in Supp. of Pl.'s Mot. for a Prelim. Inj. (Pl.'s Mot.) [5-1] at 4.

Dotson's request contravenes at least three sources of law: Article III, the Second Amendment, and basic principles of equity.  To start, Dotson lacks standing because he is ineligible for registration for reasons independent from the weapons offense bar.  On the merits, his Second Amendment claim is unlikely to succeed because, consistent with the Second Amendment, states may use criminal disqualifiers like the weapons offense bar to limit gun ownership and carriage to individuals who are non-dangerous and law-abiding.  The weapons offense bar is likewise consistent with various principles that underly the Nation's tradition of regulating firearms.  On the remaining preliminary injunction factors, Dotson suggests that the Court must grant him an injunction because he alleges a Second Amendment violation.  But equity is not so robotic.  Rather, in cases like this one challenging a longstanding and critical public safety tool, the equities counsel in favor of enjoining the law only on a full record, regardless of whether Dotson has made a merits showing now.  And because the equities, facts, and law do not support a preliminary injunction, they certainly do not support a *permanent* injunction.  Thus, the Court should deny Dotson's Motion [5].

## BACKGROUND

District law regulates the possession and carrying of firearms through registration and licensing, respectively.  To possess a firearm, a person must register it.  D.C. Code § 7-2502.01(a).  The Metropolitan Police Department (MPD) issues registration certificates when certain requirements are met.  *Id.* § 7-2502.03(a).  One requirement, enacted nearly 50 years ago, is that an applicant must not have been "convicted of a weapons offense."  *Id.* § 7-2502.03(a)(2); *see* Firearms Control Regulations Act of 1975, D.C. Law 1-85, § 203, 23 D.C. Reg. 1,091, 1,100 (Aug. 10, 1976).[1]  A "'[w]eapons offense' means any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device."  D.C. Code § 7-2501.01(18).  If a registration certificate is denied based on the weapons offense bar (or for any other reason), the individual may appeal within MPD, then to the Office of Administrative Hearings (OAH), and then to the D.C. Court of Appeals.  *Id.* §§ 7-2502.10(a)–(b), 2-1831.16(e), 2-1831.03(b-2)(2).

District law also allows the carrying of a concealed pistol with a license issued by MPD.  *Id.* §§ 22-4504(a), 22-4506.  To qualify, the applicant must, among other things, meet the requirements for a person registering a firearm and register the pistol he or she intends to carry.

---

[1]    The law exempts "an infraction or misdemeanor violation under [D.C. Code] § 7-2502.08, § 7-2507.02, § 7-2507.06, or § 7-2508.07."  D.C. Code § 7-2502.03(a)(2).  Sections 7-2502.08, 7-2507.02, and 7-2507.06 list duties for firearm registrants and already provide for denial or revocation of registration as a consequence for a violation, depending on the severity and recency of the offense.  *See id.* §§ 7-2502.08(e)(2)–(3), 7-2502.03(4)(E).  Similarly, section 7-2508.07 concerns the Gun Offender Registry, and those subject to the registry would already face denial or revocation of registration due to their original firearm offense.

*Id.* § 7-2509.02(a)(2).  If a license application is denied, an individual may appeal to OAH and then to the D.C. Court of Appeals.  *Id.* §§ 7-2509.08(a), 2-1831.03(b-2)(5), 2-1831.16(e).

Dotson applied for a firearm registration certificate and concealed carry license in 2023.  Pl.'s Mot. at 5.  As part of his applications, Dotson twice answered "no" when asked whether he had ever been convicted of a weapons offense.  Defs.' Ex. 1, Firearm Registration Application (Reg. App.) at 1; Defs.' Ex. 2, Concealed Carry Pistol License Application (CPL App.) at 1.  But that was untrue.

In 2015, United States Park Police tried pulling over Dotson and a friend, Delonte West, who were speeding on the Suitland Parkway, a highway administered by the National Park Service in Maryland.  Defs.' Ex. 3, Crim. Compl. at 2.  Dotson and West refused to stop, and Park Police saw Dotson stuff something under the driver's seat.  *Id.*  When Park Police eventually blocked the car, Dotson tried to escape but was subdued.  *Id.*  Park Police searched the vehicle and found a loaded handgun with 11 rounds in the magazine and one in the chamber, as well as a round on the car's floor.  *Id.*  Park Police also searched Dotson and West and found marijuana on them.  *Id.*

Dotson was charged with unlawful possession a loaded weapon, 36 C.F.R. § 2.4,[2] and possession of a controlled substance, 21 U.S.C. § 844(a).  *Id.*  The first count carried a maximum term of imprisonment of six months, 18 U.S.C. § 1865(a), and the second count carried a maximum of one year, *id.* § 844(a).  Dotson was convicted on both counts after a bench trial in 2016.  Defs.' Ex. 4, Crim. J. at 1.  The district court sentenced him to, among other things, 90 days' imprisonment for possession of a loaded weapon and 18 months' probation for possession

---

[2]    At the time of Dotson's arrest, 36 C.F.R. § 2.4(c) provided that "[c]arrying or possessing a loaded weapon in a motor vehicle, vessel or other mode of transportation is prohibited" in a National Park System unit.

of a controlled substance. *Id.* at 2–3. As part of his sentence, Dotson could not possess a firearm for 18 months. *Id.* at 4. Dotson, however, repeatedly and admittedly violated the terms of his probation order. Defs.' Ex. 5, Probation J. at 1. For the violations, the court revoked Dotson's probation and sentenced him to an additional 30 days' imprisonment. *Id.* at 2.

This was not Dotson's only run-in with the law. Dotson was arrested for brandishing an illegally owned gun, carjacking a victim, and stealing the victim's wallet and phone. Defs.' Ex. 6, June 1, 2014, *Gerstein* Aff. at 1. In another incident, Dotson was arrested after he cut his mother with a butcher knife during a fight. Defs.' Ex. 7, Dec. 22, 2012, *Gerstein* Aff. at 1. In two other incidents, Dotson was arrested for (1) drug possession, and (2) resisting arrest and drug possession. Defs.' Ex. 8, Pretrial Servs. Rep. at 2.

This criminal history was revealed to MPD when it ran a background check as part of processing Dotson's applications. MPD denied Dotson's application for a registration certificate because his conviction for unlawful possession of a loaded firearm qualified as a weapons offense. Pl.'s Ex., Jan. 10, 2024, Reg. Denial [5-4] at 1. Since Dotson was ineligible for a registration certificate, MPD also denied his application for a concealed carry license. Pl.'s Ex., Jan. 10, 2024, License Denial [5-4] at 1. Because those grounds were sufficient to deny the applications, MPD did not detail additional grounds. Defs.' Ex. 11, Decl. of Michael O'Harran (O'Harran Decl.) ¶ 7. Later, MPD clarified to Dotson that he was also ineligible for a registration certificate and license because he misrepresented his criminal history when applying. *Id.* ¶¶ 9–13; Defs.' Ex. 9, Sept. 9, 2024, Firearm Registration Certificate Denial Ltr. (Reg. Ltr.); Defs.' Ex. 10, Sept. 9, 2024, Concealed Pistol License Denial Ltr. (CPL Ltr.).

More than five months after receiving his initial denial, Dotson sued the District. Compl. [1]. He alleges that the weapons offense bar violates the Second Amendment. *Id.* ¶¶ 29–56. He

seeks declaratory, injunctive, and monetary relief.  *Id.*  After filing his Complaint, Dotson waited

a few days and then moved for a preliminary injunction.  Pl.'s Mot. at 1.  He asks the Court to

enjoin enforcement of the weapons offense bar because it is invalid "facially and as applied to

him."  *Id.* at 2.[3]  He also asks the Court to waive a bond requirement, enter final judgment, and

permanently enjoin the weapons offense bar.  *Id.* at 18–19.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary remedy[.]'"  *Archdiocese of Wash. v.

WMATA*, 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting *Monsanto Co. v. Geertson Seed Farms*,

561 U.S. 139, 165 (2010)).  "The moving party must make a 'clear showing that four factors,

taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence

of preliminary relief, a balance of the equities in its favor, and accord with the public interest.'"

*Id.* (quoting *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016)).  "The balance

of harms and the public interest factors merge when the government is the opposing party."

*Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021).

## ARGUMENT

I.    Dotson Is Unlikely to Succeed on the Merits.

A.    Dotson Lacks Standing Because He Is Ineligible for Registration Regardless
of the Weapons Offense Bar.

The Court can deny Dotson's motion without reaching the Second Amendment issues

because Dotson lacks standing.  A movant for a preliminary injunction must prove standing.

---

[3]    Dotson is inconsistent when requesting relief.  At times, he says that he "challenges" the
weapons offense bar "facially and as applied to him," Pl.'s Mot. at 2, but at other times, he limits
his requested relief to himself, Text of Proposed Order [5-6].  To be comprehensive, the District
addresses below all forms of relief mentioned by Dotson.  Nonetheless, the Court should not
enter an injunction that extends past Dotson because an injunction "limited" to him is sufficient
to remedy *his* "injury."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* (*EPIC I*), 878 F.3d 371, 377 (D.C. Cir. 2017).  Standing requires an "injury fairly traceable to" the challenged law that is "likely to be redressed by the requested relief."  *California v. Texas*, 593 U.S. 659, 668–69 (2021) (internal quotation marks and citation omitted).

Dotson falters on causation and redressability.  Generally, when "a separate action . . . independently causes the same alleged harm as the challenged action," plaintiffs are "unable to establish the 'necessary causal connection' between the [challenged action] and their purported injury."  *Delta Constr. Co. v. EPA*, 783 F.3d 1291, 1296–97 (D.C. Cir. 2015) (per curiam).  After all, an injury is not "redressable" if enjoining the challenged law would "have no real effect" because other laws or government actions cause the same injury.  *Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 465 (D.C. Cir. 2018) (internal quotation marks and citation omitted)).  That is, "one absolute barrier" to relief will "only" cause "sufficient injury" "if its removal would mean that all other barriers to the ultimately sought relief were likely to fall."  *Von Aulock v. Smith*, 720 F.2d 176, 180 (D.C. Cir. 1983).  Accordingly, "a plaintiff who challenges the denial of a benefit on one ground, but who is shown to be ineligible for the benefit on some other ground" will lack standing.  13A Charles Alan Wright et al., *Fed. Prac. & Proc.* § 3531.5 (3d ed. 2024) ("Wright & Miller"); *see also, e.g.*, *Midwest Media Prop., LLC v. Symmes Township*, 503 F.3d 456, 461–62 (6th Cir. 2007) (collecting cases from six circuits applying this rule in the license or permit context); *Kimelman v. Garland*, 588 F. Supp. 3d 84, 89 (D.D.C. 2022) (applying this rule to hold that plaintiff lacked standing to challenge one disqualifier from gun possession when another disqualifier existed).

Here, Dotson is ineligible for a registration certificate and license on grounds independent from the weapons offense bar.  Namely, he misrepresented his criminal history

when applying for registration and licensing. An applicant must be truthful and swear to the facts in his application under penalty of perjury. D.C. Code § 7-2502.05(a), (c) (registration); *id.* § 7-2509.02(e) (licensing). If an applicant misrepresents the facts, then MPD may deny the application. *E.g.*, O'Harran Decl. ¶ 11; 24 DCMR § 2337.6 ("Any knowing material omission or false statement made by or provided by the applicant may be considered grounds for denial of a conceal carry license . . . ."); D.C. Code § 7-2502.07(a) (to be granted, registration applications must be "properly executed" and MPD must verify that the "applicant is entitled and qualified under the provisions of [the registration and licensing scheme]"). Consequently, MPD determined that Dotson's misrepresentations are an independent ground for denying his applications. O'Harran Decl. ¶ 11; Reg. Ltr. at 1; CPL Ltr. at 1. No matter what happens in this case with the weapons offense bar, MPD will not be granting Dotson a registration certificate or license, so he lacks standing.[4]

    In reply, Dotson may take issue with his ineligibility. But any response should fail for two reasons. First, complaints by Dotson that MPD's decision is unreasonable, unsupported by evidence, or contrary to the statutes and regulations would be District administrative-law claims for which a federal court lacks jurisdiction. *Lightfoot v. District of Columbia*, 448 F.3d 392, 399 (D.C. Cir. 2006); *Allen v. District of Columbia*, No. 20-cv-2453, 2023 U.S. Dist. LEXIS 60950, at *15–16 (D.D.C. Mar. 31, 2023). If Dotson disagrees with MPD's decision, he may pursue an appeal with OAH and then the D.C. Court of Appeals.

---

[4]    The issue is one of standing, not mootness, because Dotson made the misrepresentations that rendered him ineligible before filing his Complaint. *See Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (explaining that standing is measured at time of filing the complaint). But the above analysis comes out the same even if analyzed under mootness. *See Lewis v. Becerra*, 111 F.4th 65, 70 n.1 (D.C. Cir. 2024). There is no live controversy because no matter "the ultimate resolution of the issues in this case," Dotson's registration status will remain unaffected. *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974).

Second, and regardless, Dotson's ineligibility was clear from the law and the facts.  The questions Dotson was asked were unambiguous.  What is more, he swore under penalty of perjury that he would be responsible for complying with all "District of Columbia laws, rules, regulations, and procedures" associated with a license, CPL App. at 3; he was not prohibited under District law from possessing a firearm, *id.*; and he provided accurate information in his applications; *id.*; Reg. App. at 2.  He thus made himself responsible for understanding the questions on the applications.  Indeed, Dotson has never disputed here that he has been convicted of a qualifying weapons offense.  Further, he cannot seriously contend that he was unaware of his prior conviction when applying.  Ordinarily, if one has been convicted of a crime, he knows he has been convicted of a crime.  *See Greer v. United States*, 593 U.S. 503, 508 (2021) ("If a person is a felon, he ordinarily knows he is a felon."); *United States v. Minor*, 63 F.4th 112, 125 (1st Cir. 2023) (en banc) (court records from misdemeanor proceedings sufficient to prove knowledge of misdemeanor that disqualified defendant from gun possession).  Thus, even if the Court has jurisdiction over a dispute about the application of a second disqualifier to Dotson, there is no valid reason to question it.[5]

Accordingly, Dotson lacks standing as a matter of law, and there are no factual issues the resolution of which would allow him to establish standing.  Put simply, he is legally ineligible for a license on grounds independent of the law he challenges.  If the Court agrees, it should dismiss Dotson's Complaint, not just deny his motion for a preliminary injunction.  Fed. R. Civ.

---

[5]    If Dotson were to contend that denying registration and licensing based on misrepresentations violates the Second Amendment, that would be a claim that he has not pleaded.  So it cannot support relief here.  *See Ravulapalli v. Napolitano*, 840 F. Supp. 2d 200, 207 (D.D.C. 2012) (stating that plaintiffs cannot amend a complaint in a brief); *cf. United States v. Scheidt*, 103 F.4th 1281, 1284 (7th Cir. 2024) ("Ordinary information-providing requirements . . . do not 'infringe' the right to keep and bear arms.").

P. 12(h)(3); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.* (*EPIC II*), 928 F.3d 95, 104 (D.C. Cir. 2019); *see Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (stating that even when applying the motion-to-dismiss standard for standing, a court "may consider materials outside of the complaint").

      **B.**      <u>**Dotson Is Unlikely to Succeed on His Second Amendment Claim.**</u>

Even if Dotson has standing, he fails to show "a substantial likelihood of success on the merits" of his Second Amendment challenge. *EPIC II*, 928 F.3d at 104 (internal quotation marks omitted) (quoting *Food & Water Watch*, 808 F.3d at 913). Such a challenge requires Dotson to first show that the law infringes on activity protected by "the Second Amendment's plain text," as originally understood and interpreted by precedent. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022); *see, e.g.*, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (stating that "a plaintiff bears certain burdens to demonstrate an infringement of his [constitutional] rights" and only if he "carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law"); *Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (holding that the challenger bears the burden at *Bruen* step one), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024). If the law infringes upon the scope of the Amendment, the law nonetheless must be upheld if it "is consistent with the *principles* that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (emphasis added). A court gleans principles and traditions from the historical record and asks whether the challenged law fits within them. *Id.* at 1897–98. A challenged law will so fit when it burdens the right for similar reasons and to a similar extent as historical precursors. *Id.* at 1898. The law, however, "need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). And there is certainly no need for close similarity when the lack of a Founding-Era analogue can be

explained.  *See Bruen*, 597 U.S. at 27.  At both steps of *Bruen*, Dotson's Second Amendment

challenge fails.

### 1.    The Weapons Offense Bar Is Consistent With the Scope of the Second Amendment.

Dotson's claim fails at *Bruen*'s first step because the Second Amendment does not extend

to individuals who present a risk of danger or disregard the law, like weapons offenders.  Dotson

presents no reason why misdemeanants or he personally should be any exception.

#### a.    The Second Amendment Extends Only to Non-Dangerous, Law-Abiding Individuals.

The weapons offense bar applies to a category of individuals that the Second Amendment

does not protect.  When the Supreme Court first recognized an individual right in the Second

Amendment, it specified that that right belongs to "law-abiding, responsible citizens."  *District of*

*Columbia v. Heller*, 554 U.S. 570, 635 (2008).  In accord with that announcement, the Court

cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding

prohibitions on the possession of firearms by felons and the mentally ill."  *Id.* at 626.  But such

"presumptively lawful regulatory measures" were only "examples," and the Court's list was not

"exhaustive."  *Id.* at 627 n.26.  Building on this precedent, the D.C. Circuit instructs that part of

the first step in a Second Amendment challenge is to determine whether the challenger is an

"offender" who "falls outside the Second Amendment's protections."  *Schrader v. Holder*, 704

F.3d 980, 988–89 (D.C. Cir. 2013).  Although neither the D.C. Circuit nor the Supreme Court

has exhaustively catalogued who falls outside the Amendment's scope, precedent has sketched

out some contours of the right.

To start, individuals who present a risk of danger can be disarmed consistent with the

Second Amendment.  The D.C. Circuit held that the Second Amendment protects "those who are

no more dangerous with a gun than law-abiding citizens generally are."  *Wrenn v. District of*

*Columbia*, 864 F.3d 650, 664 (D.C. Cir. 2017).  In other words, the Second Amendment extends to those who "pose only common levels of risk" and evince "common levels of competence and responsibility."  *Id.* at 664–65.  The *Wrenn* Court further noted that the District may use "licensing requirements" to "limit[ ]" who may carry a gun to such individuals.  *Id.* at 667.

Consistent with *Wrenn*, the Supreme Court in *Rahimi* held that "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."  144 S. Ct. at 1898.  The Court's historical analysis now helps establish "the historical scope of the Second Amendment right" at "step one of the *Bruen* framework."  *United States v. Price*, 111 F.4th 392, 401 (4th Cir. 2024) (en banc); *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1280 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that history establishes "the scope of the right").  Even before *Rahimi*, Justice Alito, joined by Justices Thomas and Gorsuch, and with agreement from Justice Kavanaugh, explained that *Heller* sketched out "the scope of the right" and "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by . . . dangerous individuals."  *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., dissenting) (internal citations omitted); *see also id.* at 1527 (Kavanaugh, J., concurring).

Nonetheless, "the scope of the Second Amendment was understood to exclude more than just individually identifiable dangerous individuals."  *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019).  Relevant here, the Second Amendment also excludes those who are not "law-abiding."  *Id.* at 154.  That group includes "those convicted of felonies"—regardless of whether the felony can be considered dangerous.  *Id.* at 160; *see Rahimi*, 144 S. Ct. at 1923 (Kavanaugh, J., concurring) (explaining that a felon-in-possession ban reflects "traditional exceptions to the

right"). Disqualification from firearm possession may be based on a "deviat[ion] from legal norms," not just a "demonstrated propensity for violence." *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024). That "logic . . . suggests that at least some misdemeanants—who are similarly not 'law-abiding citizens'—might not enjoy the Second Amendment rights that other citizens do." *United States v. Shaw*, No. 22-cr-1, 2023 WL 3619416, at *7 (D.D.C. May 23, 2023); *see also, e.g.*, *Holloway v. Att'y Gen.*, 948 F.3d 164, 175 (3d Cir. 2020); *United States v. White*, 593 F.3d 1199, 1206 (11th Cir. 2010). That is, "disregard for the basic laws and norms of our society"—as evidenced by, for example, "three . . . counts of misdemeanor fraud"—"is precisely what differentiates a criminal from someone who is 'law-abiding.'" *Medina*, 913 F.3d at 160.

To determine whether someone is non-dangerous and law-abiding, the government is not required to undertake a "case-by-case assessment." *Id.* at 161. Rather, statutes may disarm categories of individuals if such categories are consistent with the scope of the Second Amendment and the designation is justified. *See id.* at 160–61 ("A prohibition on firearm ownership . . . is a reasonable consequence of a felony conviction that the legislature is entitled to impose . . . ."); *Kanter v. Barr*, 919 F.3d 437, 464–65 (7th Cir. 2019) (Barrett, J., dissenting) (explaining that "the state can take the right to bear arms away from a category of people that it deems dangerous" and "the legislature can make that judgment on a class-wide basis" so long as the legislature is "able to justify its designation"); *Jackson*, 110 F.4th at 1128 (relying on Congress's justifications for the federal felon-in-possession ban to hold that it is a justifiable exercise of the power to disarm individuals who present a risk of danger). In fact, *Rahimi* took pains to caution that the Court did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a

legislature to present a special danger of misuse." 144 S. Ct. at 1901.  Accordingly, *Rahimi*, and *Bruen* for its part, did not disturb prior precedent about the scope of the Second Amendment—as this Court already explained.  *United States v. Lewis*, No. 24-cr-144, 2024 WL 3581347, at *2 (D.D.C. July 29, 2024) (AliKhan, J.).

> **b.** **The Weapons Offense Bar Ensures That Individuals Who Present a Risk of Danger and Are Not Law-Abiding Do Not Access Guns.**

The weapons offense bar is constitutional because it excludes from gun ownership and carrying individuals who are excluded from the Second Amendment's scope.  This is so because weapons offenders both present a risk of danger and are not law-abiding.

First, weapons offenders do not "pose only common levels of risk." *Wrenn*, 864 F.3d at 665.  Evidence bears this out.  As criminal justice expert Dr. Michael Ostermann explains, the best available studies demonstrate that individuals with prior weapons offenses are at a higher risk of committing future crimes—particularly future crimes with firearms or involving violence—than the general population.  Defs.' Ex. 12, Decl. of Michael Ostermann (Ostermann Decl.) ¶¶ 7, 14–15, 28–30.  Studies and Dr. Ostermann's opinion further reveal that even weapons offenders with only non-violent misdemeanor convictions are still at a higher risk of reoffending.  *Id.* ¶ 14–15.  More broadly, those with prior convictions, including misdemeanors, present a higher risk of committing crimes or misusing a firearm.  *Id.* ¶¶ 7, 9–10, 13–16, 32–33.

The relationship between past crimes and future harms is not controversial.  Courts have often recognized that relationship in upholding policy choices.  *E.g.*, *Ewing v. California*, 538 U.S. 11, 26 (2003) (plurality); *Schrader*, 704 F.3d at 990.  Unsurprisingly, then, our legal system has long relied on past convictions—and even just arrests—to support restrictions on liberties, including to support longer prison sentences.  *Nichols v. United States*, 511 U.S. 738, 747 (1994); Ostermann Decl. ¶¶ 8–10.  It would be an odd result if prior convictions could support

restrictions on one of "the most fundamental" liberties, the freedom from confinement, *Hurd v. District of Columbia*, 864 F.3d 671, 683 (D.C. Cir. 2017), but not restrictions on access to deadly weapons.

Dotson does not put forward evidence to dispute the relationship between weapons offenses and danger, even though he bears the burden at *Bruen*'s step one. And it is too late now. *See* LCvR 65.1(c) (a motion for a preliminary injunction "shall be supported by all affidavits on which the plaintiff intends to rely" and supplemental affidavits require leave of court); *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010) (affirming district court's decision not to consider evidence raised for the first time in reply). At most, he cites reasoning in a fractured Third Circuit opinion that the government there had not supplied sufficient evidence to satisfy intermediate scrutiny when arguing that the felon-in-possession ban, 18 U.S.C. § 922(g)(1), was constitutional as applied to individuals convicted of misdemeanors. Pl.'s Mot. at 12–13 (citing *Binderup v. Att'y Gen.*, 836 F.3d 336, 352–54 (3d Cir. 2016) (en banc)). But *Binderup* was pre-*Bruen*, applied its own outlier test, had a different record than this one, and was non-binding to begin with.

Second, weapons offenders are not law-abiding. No matter the offense, weapons offenders like Dotson have broken the law. *See, e.g.*, *Medina*, 913 F.3d at 160 (misdemeanants are not law-abiding); *Schrader*, 704 F.3d at 989 (same); *Shaw*, 2023 WL 3619416, at *7 (same); *Holloway*, 948 F.3d at 175 (same). As a result, they evince "disregard for the basic laws and norms of our society," and so they "differentiate" themselves "from someone who is law-abiding." *Medina*, 913 F.3d at 160.

What is more, the laws and norms they violate are among those most justifying disarmament. By refusing to abide by gun laws, weapons offenders demonstrate that they cannot

be trusted to keep and bear arms "responsibl[y]." *Id.* at 154. While some may question whether certain crimes should justify disarmament, "a failure to comply with a state law regulating the possession and use of deadly weapons" is "meaningfully different" from other non-violent crimes. *United States v. Dorsey*, 105 F.4th 526, 532 (3d Cir. 2024). Indeed, running through recent Supreme Court precedent is a current of protecting states' power to ensure safe handling of guns. *See, e.g.*, *Bruen*, 597 U.S. at 38 n.9 (approving requirements for license applicants "to undergo a background check or pass a firearms safety course"); *id.* at 38 ("[T]he right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing . . . the manner of carry . . . ."); *Rahimi*, 144 S. Ct. at 1896 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."). Weapons offenders, however, refuse to follow rules designed to ensure the safe handling, use, storage, and transport of guns. As such, the weapons offense bar "prevent[s]" them from "misusing firearms" again. *Rahimi*, 144 S. Ct. at 1896.

At the least, Dotson's facial challenge fails because the weapons offense bar "is constitutional in some of its applications." *Rahimi*, 144 S. Ct. at 1898. *Medina*—which this Court held is still binding—holds that a permanent ban on felon possession is constitutional. 913 F.3d at 154; *see Lewis*, 2024 WL 3581347, at *2. The weapons offense bar applies to felonies, so it is constitutional in at least those applications and thus not unconstitutional on its face.

### c.    There Is No Rule That Non-Violent Weapons-Offense Misdemeanants Cannot Be Disarmed.

Instead of addressing much of the above precedent, Dotson argues that he is covered by the Second Amendment simply because he is a citizen who has not been convicted of a felony or "violent crime," "adjudicated mentally defective," or "otherwise subject to a judicial finding of dangerousness." Pl.'s Mot. at 9; *see also id.* at 3–4 (drawing these categories of excluded

persons from *Heller* and *Rahimi*).  Relatedly, he argues that the government cannot disarm non-violent misdemeanants.  *Id.* at 10.  But the categories of excluded persons that Dotson draws from *Heller* are not "exhaustive."  *Heller*, 554 U.S. at 627 n.26.  Nor did *Rahimi* hold that a judicial finding of dangerous was the *only* means to disarm dangerous individuals.  144 S. Ct. at 1901.  To the contrary, as explained above, precedent—especially circuit precedent unmentioned by Dotson—expands the categories of excluded persons to encompass weapons offenders.  Moreover, Dotson's marquee argument that the Second Amendment draws the line at non-violent misdemeanants is wrong because precedent does not lay down such a line, and it would make little sense.  Because Dotson cannot show that the weapons offense bar crosses any line from precedent, he cannot show "a substantial likelihood of success on the merits" of his Second Amendment claim.  *EPIC II*, 928 F.3d at 104 (internal quotation marks and citation omitted).

To start, precedent has never drawn a hard line at non-violent misdemeanors.  While the Supreme Court has identified a ban on felon possession as *one* presumptively lawful measure, it has used the concept of "law-abiding" citizens to repeatedly describe the scope of the Second Amendment.  *Lewis*, 2024 WL 3581347, at *2 n.1.  If the Court only meant felons and violent misdemeanants, it would be bizarre for the Court to use the broader term "law-abiding" so many more times.

In fact, the Court's employment of the concept has indicated that it includes weapons offenders covered by the District's law.  In *Bruen*, the Court emphasized that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of "licensing regimes," which are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635).  The Court then favorably cited several states' licensing schemes.  *Id.* at 13 n.1, 38 n.9.  Many of those states

have weapons offense bars that include misdemeanants. *E.g.*, Ga. Code Ann.

§ 16-11-129(b)(2)(H); Mich. Comp. Laws § 28.425b(7)(h)(ix); Neb. Rev. Stat. § 69-2433(8); 18

Pa. Cons. Stat. § 6105(a)–(b); Va. Code Ann. § 18.2-308.09(14).[6]    The Court's approval of such

licensing regimes, even if dicta, "must be treated as authoritative." *Illinois v. Ferriero*, 60 F.4th

704, 718–19 (D.C. Cir. 2023) (internal quotation marks omitted) (quoting *Sierra Club v. EPA*,

322 F.3d 718, 724 (D.C. Cir. 2003)).

As such, courts have rejected challenges to licensing requirements—including those

applicable to licensing laws governing possession—when they resemble requirements in the

licensing schemes approved by *Bruen*. *E.g.*, *Md. Shall Issue, Inc. v. Moore*, --- F.4th ----, ----,

No. 21-2017, 2024 WL 3908548, at *9 (4th Cir. Aug. 23, 2024) (en banc); *Antonyuk v.

Chiumento*, 89 F.4th 271, 307 (2d Cir. 2023), *cert. granted, judgment vacated sub nom.

Antonyuk v. James*, 144 S. Ct. 2709 (2024);[7] *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir.

2024); *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, 682 F. Supp. 3d 874, 936–40 (D. Or.

2023), *appeal docketed*, Nos. 23-35478 & 23-35479 (9th Cir. July 17, 2023).    This Court should

reason similarly.    Like the licensing systems discussed in *Bruen*, the weapons offense bar is part

---

[6]       In contending that "the District's law is an outlier," Dotson overlooks these laws.    Pl.'s
Mot. at 12.    He also overlooks that many states, including some listed in *Bruen*, prohibit
possession by certain weapons offenders as a general matter.    *E.g.*, Cal. Penal Code
§ 29805(a)(1); Conn. Gen. Stat. §§ 53a-217, 53a-61(a); Haw. Rev. Stat. Ann. § 134-7(b); Minn.
Stat. § 624.713(1)(11); N.D. Cent. Code § 62.1-02-01(1)(b).    If Dotson's view of the
Constitution were adopted, then all these states' laws would be in jeopardy.

[7]       The Supreme Court vacated *Antonyuk* for further consideration in light of *Rahimi*.
*Antonyuk* analyzed a dangerousness standard for licensing and concluded that it was consistent
with the Second Amendment, but *Rahimi* did not address licensing regimes at all.    In such
circumstances, a vacated decision like *Antonyuk* retains its persuasive authority.    *See United
States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006) (stating rule that the D.C. Circuit treats
as authoritative holdings in decisions that have been vacated and remanded by the Supreme
Court for further consideration in light of another case); *Brown v. Kelly*, 609 F.3d 467, 477 (2d
Cir. 2010) (treating a vacated decision as persuasive authority); *McKenzie v. Day*, 57 F.3d 1493,
1494 (9th Cir. 1995) (same).

of a licensing scheme and, as explained, ensures that only non-dangerous and law-abiding citizens access guns.  *See Heller II*, 670 F.3d at 1248, 1255 (explaining that the District's registration system operates a "licensing" law governing possession); Defs.' Ex. 17, Council. of the Dist. of Columbia, Comm. on the Jud., *Report on Bill 19-614, "Firearms Amendment Act of 2012"* 6–8 (Feb. 29, 2012) ("Comm. Rep.") (explaining how the registration system is necessary for the District to screen potential gun owners).  Because the weapons offense bar resembles requirements approved by *Bruen*, that is a strong indication that it is not constitutionally suspect.[8]

The D.C. Circuit, for its part, has never drawn the constitutional line at non-violent misdemeanors.  Rather, the *Medina* Court specifically reserved whether misdemeanants could be excluded from the Second Amendment's scope.  913 F.3d at 160.  In addition, that Court upheld 18 U.S.C. § 922(g)(1), which prohibits firearm possession by persons convicted of "a crime punishable by imprisonment for a term exceeding one year."  *Id.* at 154.  Although such crimes are commonly considered felonies, some states use different classification systems.  *Burgess v. United States*, 553 U.S. 124, 130, 132 (2008).  As a result, there are many misdemeanors that trigger § 922(g)(1).  *E.g.*, *Schrader*, 704 F.3d at 982, 987.  So it cannot be true that the protections of the Second Amendment turn on whether a prior offense was labeled a misdemeanor or felony.

Outside this circuit, courts have held that non-violent misdemeanants can fall outside the scope of the Second Amendment.  *E.g.*, *Holloway*, 948 F.3d at 173–77 (misdemeanor driving

---

[8]   If the Court disagrees that *Bruen*'s discussion is applicable to licensing laws governing possession, then the discussion at least indicates that the weapons offense bar is constitutional to the extent it acts as a qualification for a concealed carry license.  *See* D.C. Code § 7-2509.02(a)(2).

under the influence where violence is not an element).  Most instructive here, courts have upheld the federal ban on firearm possession by domestic violence misdemeanants, 18 U.S.C. § 922(g)(9), reasoning that such misdemeanants are analogous enough to felons.  *E.g.*, *United States v. Bernard*, No. 22-cr-03, 2022 WL 17416681, at *7 (N.D. Iowa Dec. 5, 2022); *United States v. Jackson*, 622 F. Supp. 3d 1063, 1067 (W.D. Ok. 2022).  Yet, violence (*i.e.*, the use or attempted use of force) is not a required element of a qualifying offense because "misdemeanor crime of domestic violence" is defined to include misdemeanors that have "as an element, the use or attempted use of physical force, *or* the threatened use of a deadly weapon."  18 U.S.C. § 921(a)(33)(A)(ii) (emphasis added); *see also United States v. White*, 258 F.3d 374, 382 (5th Cir. 2001) (explaining that § 922(g)(9) applies if a predicate offense contains "either" element).  Section 922(g)(9), consistently upheld by courts post-*Bruen*, thus covers non-violent misdemeanor weapons offenses—precisely the offenses that Dotson says cannot be a basis for possession prohibitions.  All said, the line that Dotson advocates is hardly etched in precedent.

Even if the Court were to reason from first principles, Dotson's line makes little sense. Courts should be loath to "craft[ ] constitutional rules based on the distinction between modern day misdemeanors and felonies."  *Lange v. California*, 594 U.S. 295, 333 (2021) (Roberts, C.J., concurring in the judgment).  After all, "numerous misdemeanors involve conduct more dangerous than many felonies."  *Tennessee v. Garner*, 471 U.S. 1, 14 (1985).  For example, states criminalize, as a misdemeanor with a term of imprisonment of less than a year, the brandishing of a weapon to threaten another person.  *E.g.*, Va. Code § 18.2-282(a); Cal. Penal Code § 417(a).  Such crimes are non-violent misdemeanor weapons offenses, yet they represent a greater threat to harm—in fact, such a threat or fear of harm is an element, *id.*—than some felony offenses, like fraud.  Indeed, those misdemeanor weapons offenses seem like a comparable

indicator of dangerousness to the conduct considered by the Supreme Court in *Rahimi*. *See Rahimi*, 144 S. Ct. at 1895 (describing how Rahimi fired a gun, although it was not clear that he was aiming at his girlfriend, and later threatened to shoot her). But under Dotson's proposed rule, states are powerless to use these offenses as indicators that an offender is too dangerous to have a gun—simply because these offenses are labeled misdemeanors and do not have violence as an explicit element. That cannot be right.

        **d.**      **<u>Dotson Fails to Identify Any Other Characteristics That Make Him Non-Dangerous and Law-Abiding Despite His Conviction.</u>**

As explained, Dotson's challenge fails because weapons offenders as a class pose a risk of danger and are not law-abiding, and Dotson indisputably falls within that class. *See Medina*, 913 F.3d at 160–61. Dotson does not argue that any of his other characteristics place him back in the scope of the Second Amendment despite his conviction, so such an argument is forfeited. *EPIC I*, 878 F.3d at 374 n.1. Regardless, it would fail on the law and the facts.

On the law, the D.C. Circuit has never held that personal circumstances factor into the analysis. The Court has only reserved that they "may." *Medina*, 913 F.3d at 160. At this stage, without clearer rules from the D.C. Circuit or argument from Dotson about what those rules should be, this Court cannot conclude that Dotson is substantially likely to succeed on a claim that his personal characteristics entitle him to Second Amendment protection despite his disqualifying conviction.

On the facts, there are no sufficiently mitigating circumstances here. Dotson's weapons offense is hardly "insignificant." Pl.'s Mot. at 1. Carrying loaded firearms is "dangerous," "as they could fire accidentally." *United States v. Masciandaro*, 638 F.3d 458, 473 (4th Cir. 2011). "[W]hen concealed within a motor vehicle, a loaded weapon becomes even more dangerous." *Id.* Recognizing the significance of Dotson's offense, a federal court sentenced him to three-

months' imprisonment.  *Cf. Holloway*, 948 F.3d at 176 (a three-month sentence reflects a

"judgment" than an offense is "serious").

  Besides his weapons offense conviction, Dotson's history reflects a risk of danger and

disregard for the law.  First, Dotson has an additional conviction for drug possession.  Crim. J. at

1.  Additional misdemeanors evince that an individual is not law-abiding.  *Medina*, 913 F.3d at

160.  And a prior drug charge alone increases risks of future crimes.  Ostermann Decl. ¶ 26.  Not

to mention, Dotson possessed drugs at the same time he was driving around with a loaded

firearm.  Crim. J. at 1.  This is uncommonly risky behavior because the presence of drugs and

firearms together compounds the risks of dangers from each.  *See United States v. Veasley*, 98

F.4th 906, 916–17 (8th Cir. 2024); *United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023);

*United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010).  Second, Dotson repeatedly and

admittedly violated the terms of his probation.  Crim. J. at 4.  "[M]ultiple violations of the

conditions of probation forge a solid predicate for . . . finding that [Dotson] was unrepentant and

demonstrated blatant disregard for the law and for the rule of the law."  *United States v. De

Jesus*, 277 F.3d 609, 612 (1st Cir. 2002) (internal quotation marks omitted).  Third, besides these

convictions, Dotson has been arrested for violent crimes and more drug possession.  Those

arrests alone put Dotson at a higher risk of subsequent violent crimes.  Ostermann Decl. ¶¶ 17–

22.  Fourth, it is hard to conclude that Dotson can be trusted with a gun when he misrepresented

his criminal history when trying to get a gun.  Finally, a federal court determined that he could

not be trusted with firearms for a year and a half.  Prob. J. at 1–2.  All said, Dotson has not made

a substantial showing that "he may still count as a 'law-abiding, responsible citizen.'"  *Medina*,

913 F.3d at 160.

Dotson suggests in passing that he can be trusted with a firearm because he is licensed as a "Special Police Officer," Pl.'s Mot. at 5; the federal government "trusts" him with a firearm "because he is employed at the National Archives," *id.*; and he has permits from other states, *id.* at 12.[9] But it is not clear from *Medina* that any of these allegations would be relevant, *see* 913 F.3d at 160, and Dotson does not make a *Medina*-based argument.  Nonetheless, these allegations are unavailing.  The Second Amendment "is not some sort of edict to the rest of the states, obligating them to" impose the same licensing standards.  *Bianchi v. Brown*, --- F.4th ----, ----, No. 21-1255, 2024 WL 3666180, at *5 (4th Cir. Aug. 6, 2024) (en banc), *pet. for cert. docketed sub. nom Snope v. Brown*, No. 24-203 (U.S. Aug. 23, 2024).  Rather, it makes sense that Dotson's employer or other states may have different standards because "the District is different."  *Heller v. District of Columbia* (*Heller III*), 801 F.3d 264, 283 (D.C. Cir. 2015) (Henderson, J., concurring in part and dissenting in part).  For example, special police officers are privately hired security contracted to patrol specific property.  6-A DCMR § 1100.  Because their gun-carrying abilities are strictly limited, *id.* § 1103, it is unsurprising that their standards may be different from the District's, which are designed, among other things, to protect the public and prevent domestic violence.  Further, Dotson admitted that his carrying abilities are much more limited than he let on in his brief.  Defs.' Ex. 16, Pl.'s Resps. to Defs.' 1st Set. of Interrogs. (Interrogs.) at 1.

---

[9]    Dotson is not "trust[ed]" by the National Archives or employed by the Archives.  Pl.'s Mot. at 5.  He is employed by a private security company that contracts with the Archives.  Defs.' Ex. 16, Pl.'s Resps. to Defs.' 1st Set. of Interrogs. at 1.  He has not provided any evidence that the Archives screened him in any way.

\* \* \*

At bottom, no precedent holds that the Second Amendment extends as far as Dotson says. That is enough to reject his claim. *Medina v. Sessions*, 279 F. Supp. 3d 281, 293 (D.D.C. 2017), *aff'd*, 913 F.3d 152; *Masciandaro*, 638 F.3d at 475. And that is certainly enough to deny a preliminary injunction. As the best expert on the common law, Justice Holmes, explained, traditionally "no injunction ought to issue" in challenges to democratically enacted state laws unless the legal issues are "reasonably free from doubt." *Mass. State Grange v. Benton*, 272 U.S. 525, 527 (1926). That is, a preliminary injunction is not the occasion for a trial court to expand the Constitution and case law to the detriment of the people's will. *See id.* Here, neither the Supreme Court nor the D.C. Circuit has held or even suggested that the right of "law-abiding, responsible citizens" to keep and carry arms nonetheless precludes governments from enacting weapons offense bars like the District's. *Medina*, 913 F.3d at 154. Thus, Dotson cannot show "a substantial likelihood of success on the merits." *EPIC II*, 928 F.3d at 104 (internal quotation marks and citation omitted).

### 2.    The Weapons Offense Bar Is Consistent With Historical Principles.

Because Dotson has not carried his burden at *Bruen*'s step one, his challenge fails. Still, historical "principles" concerning the government's power to disarm dangerous and law-breaking individuals—via criminal disqualifiers, legislation, or licensing—also support the weapons offense bar. *Rahimi*, 144 S. Ct. at 1898.

#### a.    The Historical Record Establishes That the Government May Disarm Individuals Who Pose a Danger or Violate Legal Norms, Including Through Criminal Disqualifiers, Class-Based Laws, and Licensing.

Three "principles" emerge from the historical record and support the weapons offense bar today. *Rahimi*, 144 S. Ct. at 1898. The first was recognized in *Rahimi*: the government has long

been allowed to disarm individuals who are likely to misuse a gun. *Id.* at 1902. The Supreme Court recognized that principle based on just two types of historical laws, surety and "going armed" laws. *Id.* at 1901. A surety law "authorized magistrates to require individuals suspected of future misbehavior to post a bond. If an individual failed to post a bond, he would be jailed. If the individual did post a bond and then broke the peace, the bond would be forfeit." *Id.* at 1900 (internal citations omitted). In addition, the justice could restrict gun possession. Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U.L. Rev. 139, 168 (2021). The justice could order sureties based on his discretion because surety laws were "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion." 5 William Blackstone, *Commentaries* \*252 (St. George Tucker ed., 1803) (1767). But at least ten jurisdictions amended their surety laws to specifically provide that they would be triggered by "misuse of firearms." *Rahimi*, 144 S. Ct. at 1900.

"While the surety laws provided a mechanism for preventing violence before it occurred, a second regime provided a mechanism for punishing those who had menaced others with firearms. These were the 'going armed' laws," which criminalized "the offense of 'arm[ing]' oneself 'to the Terror of the People.'" *Id.* at 1900–01 (quoting T. Barlow, *The Justice of the Peace: A Treatise* 11 (1745)). Going armed laws "punished these acts with 'forfeiture of the arms . . . and imprisonment.'" *Id.* at 1901 (quoting 4 Blackstone, *supra*, at \*149).

A second historical principle at play here is that the government could disarm individuals who failed to abide by legal norms. As the D.C. Circuit explained, those who committed felonies—even non-violent ones—faced forfeiture of their guns and death. *Medina*, 913 F.3d at 158. Beyond felonies, various offenses involving firearms, some non-violent, specifically

resulted in forfeiture of the arms, as explained by a leading Founding-Era historian and courts. Defs.' Ex. 14, Decl. of Nathan Kozuskanich (Kozuskanich Decl.) ¶ 15; *Jackson*, 110 F.4th at 1127. Guns could also be confiscated for the common good even without commission of crime. Kozuskanich Decl. ¶ 17. For example, early American governments confiscated guns held by those who refused to join military associations, refused to declare an oath, were suspected of planning a rebellion, or were generally "unfriendly to the views of Congress." *Id.* (internal quotation marks and citation omitted); *Jackson*, 110 F.4th at 1126–27.

A third historical principle is that, when determining who was too risky to own a gun, the government could use a variety of means, including criminal disqualifiers, class-based legislation, and licensing. Starting with criminal disqualifiers, by including forfeiture as a consequence of conviction, many crimes served to disqualify early Americans from weapons possession. Kozuskanich Decl. ¶¶ 15–17; *Medina*, 913 F.3d at 158; *Jackson*, 110 F.4th at 1126–27. And a close review of those laws reveals that, under some of them, "recovery of the firearm was impossible," so the offense resulted in a permanent or long-term ban on possession. Kozuskanich Decl. ¶ 16. In accord, the "highly influential" Pennsylvania proposal from the dissenting minority in the ratification convention to amend the Constitution, *Heller*, 554 U.S. at 604, guaranteed the right to arms "unless for crimes committed, or real danger of public injury from individuals," *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (internal quotation marks and citation omitted). That source similarly indicates that a criminal conviction could trigger disarmament. *Medina*, 913 F.3d at 159.

Next, governments disarmed classes of people who the state deemed dangerous or to have demonstrated disrespect for the law. Kozuskanich Decl. ¶ 15. These classes were varied and included, among others, Native Americans, enslaved persons, religious minorities, rebels,

those who refused to swear an oath, and those who refused to join military associations.  *Id.*
¶¶ 15–17; *Jackson*, 110 F.4th at 1126, 1128.  This traditional legislative power was
uncontroversial.  Such disarmament laws were recommended by the Continental Congress.  4
*Journals of the Continental Congress 1774–1789* 205 (1906).  But such laws were not seen as
incompatible with a right to keep and bear arms.  To illustrate, Pennsylvania enacted such a
disarmament law, which was "particularly notable as Pennsylvania's constitution at the time
strongly protected an individual right to bear arms."  Joseph Blocher & Caitlan Carberry,
*Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* 9 (June 4, 2023), Duke L.
Sch. Pub. L. & Legal Theory Series No. 2020-80, https://tinyurl.com/m5r2pefs.  In fact, the
District is unaware of any historical precedent invalidating such laws as violative of the right to
keep and bear arms.

To the contrary, this traditional legislative power was also well rooted.  The English Bill
of Rights—the first codification of the right to bear arms and the Second Amendment's
predecessor, *Heller*, 554 U.S. at 599—provided that Protestants "may have arms for their
defence suitable to their conditions and as allowed by law," An Act Declaring the Rights and
Liberties of the Subject and Settling the Succession of the Crown, 1 W. & M., Sess. 2, c. 2, § 7
(1689).  "[A]s the document itself memorialized," English law recognized "the principle that
arms-bearing was constrained 'by Law.'"  *Rahimi*, 144 S. Ct. at 1899.  This "ensured that
Parliament could define which persons could be armed—'suitable to their Condition'—and
under what circumstances those arms could be borne—'as allowed by Law.'"  Patrick J. Charles,
*Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 61
(2018); *see also Jackson*, 110 F.4th at 1126.  In sum, and as courts have recognized, "[h]istory

shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people." *Jackson*, 110 F.4th at 1126.

Over time, American governments shifted to using licensing as a means of determining who could be trusted with a gun. Defs.' Ex. 15, Decl. of Brennan Rivas (Rivas Decl.) ¶¶ 23–29. Early licensing laws tended to be discretionary and left it to public officials to use their judgment to decide whether to license an individual. *Id.* ¶ 26. But some, and then an increasing number, used more defined standards. *Id.* ¶ 27. For example, by the mid-19th century, New York and Brooklyn (two of the highest population areas in the United States at the time) required that a licensing official determine whether the applicant was a "proper and law-abiding person." *Id.* (internal quotation marks and citations omitted). Licensing became one of the dominant forms of gun regulation for the next 150 years, all "without constitutional qualms or challenges." *Antonyuk*, 89 F.4th at 320. Over that 150-year period, licensing laws evolved to rely on clearer standards and more comprehensive rules instead of the unbounded discretion that characterized early laws. Rivas Decl. ¶¶ 10, 29. Bars on licensing individuals convicted of enumerated crimes, like the weapons offense bar, were among those clearer standards. *Id.* ¶ 10. Thus, as a historian relied upon by numerous courts opined, there is a historical throughline from early American firearm regulation to the law challenged here. *Id.*

        **b.**    **The Weapons Offense Bar Is Relevantly Similar to Historical Precursors.**

Applying these historical principles here, the weapons offense bar is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29). Two "metrics" for similarity are "why" and "how" "the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29.

The weapons offense bar shares the "why" with historical laws. Like surety laws, going armed laws, and laws disarming dangerous classes, the weapons offense bar is aimed at "preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 144 S. Ct. at 1896. A weapons offender—no matter the offense—presents a risk of future harm and firearm misuse, so prohibiting gun possessing "prevent[s]" him from doing "harm" and "misusing firearms" again. *Id.*; *see* Ostermann Decl. ¶¶ 7, 14, 16, 23, 30–33. Consistent with surety laws, going armed laws, felon forfeiture, penalties for weapons offenses, and laws disarming classes who have shown a disregard for the law, the weapons offense bar is also aimed at removing guns from those who demonstrate that they cannot abide by our society's laws—and gun laws in particular.

Next, the weapons offense bar shares the same "how" as historical precursors. First, the weapons offense bar can be perceived as a criminal disqualifier. In that way, it resembles Founding Era felon forfeiture and other weapons offenses resulting in forfeiture because it restricts gun ownership following conviction for certain crimes. Second, the weapons offense bar also can be seen as a form of class-based disarmament. As explained above, at the Founding, governments enjoyed the unquestioned power to use legislation to disarm classes of people who either presented a danger or deviated from legal norms. Similarly, the weapons offense bar is a statute reflecting the legislative judgment, with approval from the executive, that weapons offenders as a class present a risk of harm or have demonstrated a disregard of the law that renders them too risky to own a gun. Finally, the weapons offense bar operates as part of a licensing scheme, and for 150 years governments have been using licensing as a method to screen law-abiding, responsible citizens. *Antonyuk*, 89 F.4th at 321; Rivas Decl. ¶¶ 23–29.

In many ways, though, the weapons offense bar is *less* burdensome on the right to keep and bear arms than historical precursors.  First, class-based legislation at the Founding relied on poor, abhorrent proxies for dangerousness, like race or religion.  But weapons offenses have an empirically validated connection to dangerousness and disregard for the law, so the bar does not "burden a *law-abiding* citizen's right to armed self-defense."  *Bruen*, 597 U.S. at 29 (emphasis added); *see United States v. Nutter*, 624 F. Supp. 3d 636, 643–44 (S.D.W. Va. 2022) (reasoning similarly to uphold § 922(g)(9)).  Second, all the laws discussed in *Rahimi*, including the modern law that the Court upheld, allowed dispossession after a discretionary finding by just one individual that a person posed a credible threat.  *Rahimi*, 144 S. Ct. at 1900–01.  A judge made such a finding in Rahimi's case based on a single affidavit without explanation of what facts in the affidavit supported the finding.  *Id.* at 1896; Jt. App'x at 2, *Rahimi*, 144 S. Ct. 1889 (No. 22-915).  But the weapons offense bar requires more: namely, a conviction with all the procedural protections afforded in a criminal proceeding.  *See United States v. Donahue*, 680 F. Supp. 3d 812, 817 (S.D. Tex. 2023) (reasoning similarly to uphold § 922(g)(9)).  On top of that, the District provides layers of administrative and judicial review for the applicant to contest whether the offense indeed qualifies as a weapons offense.  Third, historical laws defined danger amorphously or not at all.  For example, early licensing laws were entirely discretionary.  Rivas Decl. ¶ 26.  But the weapons offense bar is clearer and more objective because it requires (1) a conviction (2) that meets a statutory definition.

Dotson, nonetheless, tries to divorce the weapons offense bar from history in three ways.  None is persuasive, especially because he does not cite a single historical source, instead relying on a law review article by a corporate lawyer.  Pl.'s Mot. at 8–13.  Nor, tellingly, does he ever engage with *Rahimi*, which clarified the mode of historical analysis that courts must apply.

First, Dotson makes much of the observation that a weapons offense bar was not present earlier in history. *Id.* at 10. *Rahimi*, however, admonished that *Bruen* is "not meant to suggest [that] a law trapped in amber" is the only type of firearm regulation that is valid today. 144 S. Ct. at 1897. Rather, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. For the reasons above, the weapons offense bar "is by no means identical to these founding era regimes, but it does not need to be" because it "fits neatly within the [Nation's] tradition." *Id.* at 1901.

Moreover, Dotson errs in reasoning from historical silence. Simply because earlier legislatures did not pass similar laws does not mean that modern laws are unconstitutional. *Id.* at 1925 (Barrett, J., concurring); *see id.* at 1897 (majority). To the contrary, the lack of a weapons offense bar can be explained by "societal" and "technological changes." *Bruen*, 597 U.S. at 27. Early American governments lacked the impetus or administrative means to enact extensive registration and licensing laws. Kozuskanich Decl. ¶¶ 18–23. But over the 19th century, a few things grew: population, cities, local government, and crime; while one thing shrank: the size of firearms. Rivas Decl. ¶¶ 12–17, 29, 36–40. The result was that the carriage of easily fired and concealed firearms presented a greater risk to Americans' safety as the 19th century wore on, thus prompting lawmakers to turn to licensing schemes. *Id.* ¶¶ 18, 23. These laws were originally discretionary but evolved to use standards like the weapons offense bar today and to apply to possession. *Id.* ¶ 10. While early licensing laws concerned carriage, other regulations targeted possession, and an exactly similar possession-regulation scheme like the District's registration system was simply not feasible until local government capabilities developed. *Id.* ¶¶ 30–40.

Second, Dotson argues that disarmament laws historically required an "individualized determination of dangerousness" and would not be triggered by non-violent misdemeanors. Pl.'s Mot. at 10. This is just not true. *E.g.*, Kozuskanich Decl. ¶¶ 15–17; *Jackson*, 110 F.4th at 1127–28. Most poignantly, class-based disarmament laws required no individualized determination or *any* criminal conviction. Although Dotson takes issue with relying on those laws because they would be unconstitutional today under other provisions, Pl.'s Mot. at 11, the laws still inform our understanding of the historical scope of the Second Amendment, *e.g.*, *Medina*, 913 F.3d at 159; *Kanter*, 919 F.3d at 458 & n.7 (Barrett, J., dissenting); *Jackson*, 110 F.4th at 1127.

Other sources, too, indicate that Dotson relies too heavily on the misdemeanor label or violent vs. non-violent distinction. As the D.C. Circuit already explained, "the public in the founding era understood that the right to bear arms could exclude at least some nonviolent persons." *Medina*, 913 F.3d 159. Indeed, the Massachusetts proposal, which the court relied on, indicated that "criminals"—not necessarily just felons or non-violent offenders—"were proper subjects of disarmament." *Id.* Further, various gun offenses of even minor severity could result in disarmament. Kozuskanich Decl. ¶¶ 15–17. Moreover, it makes little sense to rely on the misdemeanor-felony distinction at the Founding when determining constitutional limits today. "At common law . . . many very serious crimes, such as kidnapping and assault with the intent to murder or rape, were categorized as misdemeanors." *Johnson v. United States*, 559 U.S. 133, 149–50 (2010) (Alito, J., dissenting). So earlier distinctions often reflect history, not logic. *United States v. Watson*, 423 U.S. 411, 438–41 (1976) (Marshall, J., dissenting).

Third, Dotson suggests that the weapons offense bar is ahistorical because it bans possession. Pl.'s Mot. at 10. Again, not so. All kinds of possession bans existed at the Founding and throughout history. *E.g.*, Kozuskanich Decl. ¶¶ 15–17; Rivas Decl. ¶¶ 30–34.

31

And they applied based on something less than a weapons offense: personal traits, refusal to take an oath, one judge's finding of a threat, etc.

Plus, bans on possession are not per se unconstitutional.  The Supreme Court has "never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession."  *Rahimi*, 144 S. Ct. at 1902.  Instead, the Court has "stated that *many* such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'"  *Id.* (emphasis added).  Still further, the Court relied on restrictions on carrying (like going armed laws) to uphold a possession ban.  *Id.*  Although the weapons offense bar is not "temporary" like some of those laws, temporariness was only one factor the *Rahimi* Court considered.  *Id.*  History, however, shows that disarmament laws, even with permanent effect, were not limited to the narrow categories identified by Dotson.  *See Md. Shall Issue*, 2024 WL 3908548, at *18 (Rushing, J., concurring in the judgment).

## II.    Dotson Will Not Suffer Imminent, Irreparable Harm Absent Relief.

Turning to the remaining factors, Dotson gives just one reason why he suffers irreparable harm absent an injunction: his "allegation" that a Second Amendment "violation, without more, satisfies the irreparable injury requirement."  Pl.'s Mot. at 15.  Dotson misunderstands equity, and applying the correct understanding, he fails to make the requisite showing of harm.

### A.    Allegations of Constitutional Violations Do Not Automatically Establish Irreparable Harm.

Dotson's proposition that an allegation of a constitutional violation automatically establishes irreparable harm is wrong.  As the Supreme Court unanimously held in a constitutional case post-dating every case cited by Dotson, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."  *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam).  That is true "[e]ven if [the Court]

assume[s]" that Dotson is likely to succeed. *Id.* Rather, "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). Equity retains flexibility, so the Court "is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

Instead, the Court's role is "merely to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (internal quotation marks omitted) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). In accord with that purpose, an injunction is justified "[o]nly when the threatened harm would impair the court's ability to grant an effective remedy." Wright & Miller, *supra*, § 2948.1. Put another way, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297–98 (D.C. Cir. 2006) (internal quotation marks omitted) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). "[E]ven in claims of constitutional . . . violations, a preliminary injunction will issue only if the asserted harm will certainly accrue 'in the absence of preliminary relief'—that is, before the district court can resolve the case on the merits." *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)). And so, "[c]ourts may withhold this extraordinary remedy if a plaintiff's alleged injury does not threaten to moot the case." *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec. (DSSA)*, 108 F.4th 194, 201 (3d Cir. 2024).

Dotson's cherrypicked quotations from a few cases do not rewrite these fundamentals of equity. *See Weinberger*, 456 U.S. at 320 ("[A] major departure from the long tradition of equity practice should not be lightly implied.").  He says the "principle" that he invokes "derives from" *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality).  Pl.'s Mot. at 14.  But the D.C. Circuit held in *England* that *Elrod* is "not binding," 454 F.3d at 300 n.7, and does not create a rule that constitutional violations establish irreparable harm, *id.* at 300–03.

Dotson fares no better with *Gordon v. Holder*, 721 F.3d 638 (D.C. Cir. 2013).  While *Gordon* found that the constitutional violation there (not a Second Amendment one) equated with irreparable harm, it did not purport to overrule the more considered explanation of circuit law in *England*.  Nor could it because if *Gordon* creates the per se rule that Dotson says, then it is inconsistent with *England* and cannot control.  *Indep. Cmty. Bankers of Am. v. Bd. of Governors of Fed. Rsrv. Sys.*, 195 F.3d 28, 34 (D.C. Cir. 1999); *see also Ayele v. District of Columbia*, No. 23-cv-1785, 2023 WL 8354883, at *5 (D.D.C. Dec. 1, 2023) (explaining that while plaintiffs "point[ed] to statements in D.C. Circuit opinions" that suggest a more per se rule, *England* controls).  Plus, later Supreme Court precedent refutes such a rule.  *Benisek*, 585 U.S. at 158.  And for that reason, too, Dotson's citation to a non-binding case, *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011), is equally misplaced.  *See Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1076 (N.D. Ill. 2023) (explaining that *Ezell* "stopped short of holding that injury in the Second Amendment context" establishes irreparable harm), *aff'd*, 85 F.4th 1175; *DSSA*, 108 F.4th at 204–05 (holding that Second Amendment plaintiffs failed to show irreparable harm regardless of the merits).

**B.**     **Under the Correct Standard, Dotson Fails to Show Irreparable Harm.**

"Without a presumption in [his] favor, [Dotson's] claim of irreparable harm collapses." *DSSA*, 108 F.4th at 204; *see also Ayele*, 2023 WL 8354883, at *6–7.  Dotson does not explain

why, absent a preliminary injunction, effective "relief" will not be "available at a later date, in the ordinary course of litigation." *England*, 454 F.3d at 297–98 (internal quotation marks omitted) (quoting *Wis. Gas*, 758 F.2d at 674).  As relief here, he seeks an injunction against the enforcement of the weapons offense bar, a declaration that it is unconstitutional, and damages. Compl., Prayer.  All will still be available at final judgment if the Court does not act now.  *See Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (explaining that implementation of a statute would not prevent the Court from deciding merits of constitutional challenge later); *Singh*, 56 F.4th at 110 ("[R]edress for that past injury does not depend on obtaining preliminary relief now.").  Nor does he explain how his claims for such relief will be mooted during litigation or how this is a case where injunctive relief will become meaningless after a certain point in time.

Dotson nonetheless argues, without citation to binding authority, that Second Amendment violations are irreparable because they are "intangible and unquantifiable."  Pl.'s Mot. at 15 (internal quotation marks omitted) (quoting *Ezell*, 651 F.3d at 699).  But tangibility is only one factor to consider, and it is not the primary factor.  *England*, 454 F.3d at 297; *DSSA*, 108 F.4th at 201.  Moreover, "judges and juries assess the value of things for which there is no market," and "[c]onstitutional rights are in fact given a pecuniary value."  Samuel L. Bray, *The Purpose of the Preliminary Injunction* 10 (Aug. 9, 2024) (forthcoming 78 Vand L. Rev.), https://tinyurl.com/57vh2p99.  Dotson cannot disagree—he seeks damages here.  So it is untrue that a Second Amendment violation could not later be remedied with damages.  Unsurprisingly then, courts have rejected Dotson's argument that a Second Amendment violation qualifies as irreparable harm.  *E.g.*, *DSSA*, 108 F.4th at 204–05; *Bevis*, 657 F. Supp. 3d at 1076; *Herrera v. Raoul*, 670 F. Supp. 3d 665, 680–83 (N.D. Ill. 2023), *aff'd sub nom. Bevis*, 85 F.4th 1175.

Even if the Court were inclined to find that allegations of constitutional violations suffice to show irreparable harm, the equities can still discount that showing.  In the main, "delay in asking for preliminary injunctive relief weigh[s] against" Dotson.  *Benisek*, 585 U.S. at 160.  Dotson delayed nearly six months after learning of his denial to ask for preliminary injunctive relief.  Yet, the D.C. Circuit has held that a 44-day delay in moving for an injunction "bolstered" a decision to deny the injunction.  *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).  Dotson took four times that.

Relatedly, Dotson has lived in the District his whole adult life and could have applied for a registration certificate and license in all that time.  Interrogs. at 1.  As a result, it is hard for him to claim that his ability to defend himself is compromised absent an injunction when he was content without a gun for years.  *Cf. DSSA*, 108 F.4th at 206 ("[Plaintiff's] four-month delay suggests that it felt little need to move quickly.").  And while he alleges that he faces a "risk[ ]" of physical injury, he cites zero evidence for that assertion.  Pl.'s Mot. at 15.  Nor does he explain why a gun is the only means to protect himself from these "risks."  *Id.*  To show irreparable harm, he needed not just better explanations—but evidence.  *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017) (per curiam).  In sum, Dotson's "position[ ]" for his entire adult life has been one in which he has lacked a gun (or at least a lawfully owned gun).  *Starbucks*, 144 S. Ct. at 1576 (internal quotation marks omitted) (quoting *Camenisch*, 451 U.S. at 395).  A preliminary injunction would upset, not "preserve," that position.  *Id.*

## III.   The Balance of Harms and Public Interest Alone Support Denying an Injunction.

If the Court finds that Dotson made a sufficient showing on the merits and irreparable harm, it should nonetheless deny the injunction because the public's interests outweigh Dotson's.  *See, e.g.*, *Winter*, 555 U.S. at 31–32 (holding that balance of harms and public interest alone supported denial of an injunction); *Benisek*, 585 U.S. at 158 (same).

A.     **The Public Has Strong Interests in Popular Sovereignty, Safety, and Government Efficacy.**

Three considerations for the public weigh against the extraordinary relief that Dotson seeks.

First, an injunction overturns the will of the District's people and encroaches on their sovereignty. The law at issue here expresses the public interest and will of District residents. *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). As a result, the District would be irreparably harmed by an injunction preventing it from enforcing a democratically enacted law. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018). In fact, the weapons offense bar has been law for 50 years, while Council after Council and Congress after Congress have declined to disturb it. Nor should this Court at this very early, very truncated stage. "Without the clarity of a full trial on the merits," the Court should "err on the side of respecting [the District's and the people's] sovereignty." *DSSA*, 108 F.4th at 206; *see Benisek*, 585 U.S. at 160–61.

Second, enjoining the weapons offense bar puts public safety at risk. It is the "primary concern of every government" to protect "the safety and indeed the lives of its citizens." *United States v. Salerno,* 481 U.S. 739, 755 (1987). Accordingly, courts seriously weigh public safety risks when considering equitable relief, while recognizing that executive and legislative officials are best suited to assess public safety needs. *E.g.*, *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring); *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 864 (9th Cir. 2022); *Proctor v. District of Columbia*, 310 F. Supp. 3d 107, 117 (D.D.C. 2018). By enacting and maintaining the weapons offense bar for 50 years, the District's democratic branches have expressed their judgment that the bar protects the public. *See Cuomo*, 772 F.2d at 978. And "a court sitting in equity cannot 'ignore the judgment

37

of [the democratic branches], deliberately expressed in legislation.'" *U.S. v. Oakland Cannabis Buyer's Co-op.*, 532 U.S. 483, 497 (2001) (internal quotation marks omitted) (quoting *Va. R.R. Co. v. Ry. Emps.*, 300 U.S. 515, 551 (1937)).

Evidence supports this judgment. As Dr. Ostermann explains, studies show that denying guns to weapons offenders or individuals with prior convictions prevents future crimes and harms. Ostermann Decl. ¶¶ 7, 16, 23, 30–33. In addition, law enforcement leaders have testified, and the Council has found, that the District's "registration system increases the difficulty for prohibited persons, including criminals or juveniles, from acquiring guns." Comm. Rep. at 7.

Given the risks posed by arming weapons offenders, "the risk of error is greater if a preliminary injunction is granted than if it is denied." *Aamer v. Obama*, 742 F.3d 1023, 1044 (D.C. Cir. 2014). If the Court were to preliminarily enjoin the weapons offense bar, an untold number of weapons offenders could then become armed. As Dr. Ostermann explains, each offender, including Dotson alone, carries a risk of harm if given a gun. Ostermann Decl. ¶¶ 7, 14–15, 28–30. There is thus an empirically validated likelihood that an injunction will lead to crimes, injuries, and even deaths. Those harms "cannot be undone if the [District] ultimately wins on the merits." *Singh*, 56 F.4th at 95.

Third, an injunction enjoining enforcement of the bar against certain offenses would be difficult for law enforcement to administer. Courts consider whether "the relief requested will cause unusual disruption." *Singh*, 56 F.4th at 96–97. Burdens on the government enter into that calculus. *E.g.*, *Anatol Zukerman & Charles Krause Reporting, LLC v. USPS*, 64 F.4th 1354, 1365 (D.C. Cir. 2023). Here, making MPD draw the "non-violent misdemeanor" line suggested by Dotson at times, *see* Pl.'s Mot. at 10, will, at a minimum, "require new agency guidance"

about which weapons offenses can still be disqualifying, *Stop This Insanity, Inc. Emp. Leadership Fund v. FEC*, 902 F. Supp. 2d 23, 50 (D.D.C. 2012), *aff'd*, 761 F.3d 10 (D.C. Cir. 2014). That guidance may well require tough calls on thorny legal questions that law enforcement officers—who process applications—would have to implement. O'Harran Decl. ¶ 4.

In addition, formerly denied weapons offenders could inundate MPD with requests for reconsideration. Even enjoining the bar just as applied to Dotson could give a greenlight to formerly denied weapons offenders to bring copycat claims, whether before MPD or this Court. All these "administrative burdens" drain MPD's resources and time. *Maldonado v. District of Columbia*, No. 10-cv-1511, 2019 WL 6877913, at *5 (D.D.C. Dec. 16, 2019). As a result, other applicants could face delays—an unfairness to them. In all, an injunction here could throw a wrench into law enforcement's efforts to run an effective and critical registration and licensing system.

**B.     The Public Interest Outweighs One Plaintiff's Allegations of Injury.**

Balancing all these interests against Dotson's, the equities strongly support withholding an injunction. On one side of the scale is the expressed will of the people, nearly 50 years of undisturbed legislative judgment, the safety of nearly 700,000 District residents, the real risk of harm from even one weapons offender becoming armed, and law enforcement's ability to administer a critical registering and licensing system. On the other side of the scale is one person; with multiple convictions, many arrests, and several misrepresentations on his application; who decided he wanted a gun only recently; yet waited months to seek injunctive

relief.  The scales should tip decidedly in the District's favor.[10]  Moreover, "[t]he proposed injunction would alter 'the last uncontested status' before this suit: the [District's] longstanding policy of" denying firearm registration to weapons offenders.  *Singh*, 56 F.4th at 96 (internal quotation marks omitted) (quoting *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022)).  Denying an injunction, however, "preserve[s] the relative positions of the parties until a trial on the merits can be held."  *Starbucks*, 144 S. Ct. at 1576 (internal quotation marks omitted) (quoting *Camenisch*, 451 U.S. at 395).

Further supporting denial of an injunction is the "fluctuating legal environment" in which this case arises.  *Benisek*, 585 U.S. at 161.  Even if the Court finds that Dotson shows a substantial likelihood of success on the merits, no one can deny that there is no directly on-point precedent approving his claim.  In cases like this challenging a duly enacted, longstanding law in an area with "legal uncertainty," equity commands a cautious hand.  *Id.* at 160.  It is better to leave the law in place than strike it down by guessing how the Supreme Court will later rule.  *Id.* at 160–61.  As put more eloquently by Justice Cardozo, "[c]aution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties."  *Hawks v. Hamill*, 288 U.S. 52, 60 (1933).  That is so even "though the rights asserted by the complainants are strictly federal in origin."  *Id.* at 61.

---

[10]     For similar reasons, the Court should not grant Dotson's request to dispense with bond requirement imposed by Rule 65(c).  Pl.'s Mot. at 16–18.  The bond requirement provides security for any costs incurred by a preliminary injunction that is later overturned.  Wright & Miller, *supra*, § 2984.  If enjoined here, the District faces expenditures in time and resources to change its processing of registration and license applications.  The District also faces risks of harms caused by risky individuals, including Dotson, getting guns and the attendant law enforcement costs.

For his part, on these prongs of the preliminary injunction analysis, Dotson puts forward little argument and even less evidence. Instead, he proclaims that enforcing an unconstitutional law is not in the public interest, so he automatically establishes the remaining injunction factors. Pl.'s Mot. at 15–16. Again, Dotson wrongly reduces all the injunction factors to one. *See Singh*, 56 F.4th at 96. "In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." *Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973) (plurality). So "a court of equity may refuse to enforce or protect legal rights" when "the exercise of which may be prejudicial to the public interest." *U.S. ex rel. Greathouse v. Dern*, 289 U.S. 352, 360 (1933); *see also, e.g.*, *Benisek*, 585 U.S. at 160–61; *Weinberger*, 456 U.S. at 312–13. That makes sense because a preliminary injunction is about weighing injuries, and often injuries to the public and sovereign will outweigh injury to one plaintiff. *Weinberger*, 456 U.S. at 312. And a plaintiff cannot even claim that denying an injunction allows an unconstitutional law to be enforced because a preliminary injunction is "not in any sense intended as a final decision as to the constitutionality of the challenged statute." *Brown v. Chote*, 411 U.S. 452, 456 (1973). Heeding to these principles, courts often deny preliminary injunctions in Second Amendment challenges regardless of the likelihood of a constitutional violation.[11] So should this Court.

---

[11]    *E.g.*, *DSSA*, 108 F.4th at 204–06; *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1149 (D. Colo. 2023); *Herrera*, 670 F. Supp. 3d at 683; *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-cv-710, 2024 WL 3466482, at *29–30 (D. Vt. July 18, 2024), *appeal docketed*, No. 24-2026 (2d Cir. July 31, 2024); *Ortega v. Grisham*, No. 24-cv-471, 2024 WL 3495314, at *42 (D.N.M. July 22, 2024); *Bolton v. Bryant*, 71 F. Supp. 3d 802, 818 (N.D. Ill. 2014).

Nor does Dotson put forward any evidence to question the District's interests here.  He says—without citation—that the bar is "ineffective," and any benefits are "speculative."  Pl.'s Mot. at 16, 15.  But he had the burden to make a "clear showing" on each preliminary injunction factor, *Starbucks*, 144 S. Ct. at 1575, and that means his arguments about the public interest and balance of equities "must be supported by evidence," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).  He has none, and in any event, evidence proves the effectiveness and wisdom of laws like the District's.  Ostermann Decl. ¶¶ 7, 16, 23, 30–33.

Dotson excuses his failure by telling the Court that it cannot consider the District's interests in enforcing the law because that would be "interest balancing."  Pl.'s Mot. at 15.  But a preliminary injunction "obligates courts" to balance interests—including, importantly, the public's.  *Singh*, 56 F.4th at 96.  "Interest balancing may be forbidden when considering the merits of [Dotson's] Second Amendment claim, but it is required at this stage of the preliminary injunction analysis." *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, No. 23-cv-710, 2024 WL 3466482, at *30 n.33 (D. Vt. July 18, 2024), *appeal docketed*, No. 24-2026 (2d Cir. July 31, 2024).  And on balance, the interests favor the District.

## IV.   <u>The Court Should Not Enter a Final Judgment.</u>

Unsatisfied with the extraordinary remedy of a preliminary injunction, Dotson also seeks a permanent injunction and final judgment.  Pl.'s Mot. at 16–19.  But "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *Camenisch*, 451 U.S. at 395.  That is because, among other reasons, a defendant is not "required to fully make [its] case at the preliminary injunction hearing." *NRDC v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998).  The historical evidence marshalled here to shoulder the District's burden at *Bruen*'s step two represents the product of an abridged discovery period.  To "fully make [its] case," the District needs a full and fair discovery period to research historical

sources, allow its experts to write more detailed reports, and explore whether additional experts or avenues of research would be helpful. *Id.*; *see Convertino v. DOJ*, 684 F.3d 93, 99–100 (D.C. Cir. 2012) (instructing courts to be "generous" in granting time for discovery).[12] If, however, the Court grants Dotson's request for a rush to judgment, then the District faces clear "prejudice" because the will of the people would be overturned without the opportunity for record and defense development provided by the Federal Rules of Civil Procedure. *Angelo v. District of Columbia*, 648 F. Supp. 3d 116, 121 n.3 (D.D.C. 2022).

**CONCLUSION**

For the foregoing reasons, the Court should deny Dotson's motion for a preliminary injunction.

Date: September 9, 2024.                                Respectfully submitted,

                                                        BRIAN L. SCHWALB
                                                        Attorney General for the District of Columbia

                                                        STEPHANIE E. LITOS
                                                        Deputy Attorney General
                                                        Civil Litigation Division

                                                        */s/ Matthew R. Blecher*
                                                        MATTHEW R. BLECHER [1012957]
                                                        Chief, Civil Litigation Division, Equity Section

                                                        */s/ Honey Morton*
                                                        HONEY MORTON [1019878]
                                                        Assistant Chief, Equity Section

                                                        */s/ Adam J. Tuetken*
                                                        ADAM J. TUETKEN [242215]
                                                        THOMPSON HANGEN [90024649]
                                                        Assistant Attorneys General
                                                        Civil Litigation Division
                                                        400 6th Street, NW

---

[12]     For this reason, Dotson's reliance on *Wrenn* is misplaced because it was decided before *Bruen* became the test.

Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendants*