**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JABARI LEON DOTSON, *Plaintiff*, v. DISTRICT OF COLUMBIA, *et al.*, *Defendants*. | Civil Action No. 24 - 1864 (LLA) |

**MEMORANDUM OPINION**

Plaintiff Jabari Leon Dotson brings this action against the District of Columbia and Metropolitan Police Department ("MPD") Interim Chief Jeffery W. Carroll (collectively, "the District"). ECF No. 1.[1] Mr. Dotson alleges that the District infringed on his Second Amendment rights by denying his application to register a firearm due to a prior weapons offense conviction. *Id.* ¶¶ 29-56. He seeks declaratory, injunctive, and compensatory relief. *Id.* at 14. Mr. Dotson filed a motion seeking a preliminary injunction, ECF No. 5, which the court denied, ECF No. 19. He subsequently filed a motion for partial summary judgment on his claims for declaratory and injunctive relief, ECF No. 22, and the District filed a cross-motion for summary judgment, ECF No. 25. For the reasons explained below, the court will deny Mr. Dotson's partial motion for summary judgment and grant the District's cross-motion for summary judgment.

[1] Mr. Dotson named former Chief of Police Pamela A. Smith as a defendant, but the current Interim Chief of Police is "automatically substituted" as a party pursuant to Federal Rule of Civil Procedure 25(d).

## I. STATUTORY FRAMEWORK

The District regulates the possession and carrying of firearms in several ways. As relevant here, an individual seeking to possess a firearm must register it. D.C. Code § 7-2502.01(a). To obtain a registration certificate for the firearm, the individual must submit an application to MPD's Chief of Police, *id.* § 7-2502.03(b), who must then determine whether the applicant "is entitled and qualified" under the District's registration provisions, *id.* § 7-2502.07(a). One of those provisions, D.C. Code § 7-2502.03(a)(2) ("the weapons-offense bar"), prohibits the Chief of Police from issuing a registration certificate to any person who has "been convicted" of a qualifying "weapons offense." The term "weapons offense" includes "any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device." *Id.* § 7-2501.01(18). Notwithstanding its broad language, the weapons-offense bar excludes certain "infraction[s] or misdemeanor violation[s]" related to the District's regulatory scheme, *id.* § 7-2502.03(a)(2), such as failing to notify the Chief of Police if a registered firearm is lost, stolen, destroyed, sold, transferred, or otherwise disposed, *id.* § 7-2502.08(a), failing to carry the registration certificate when in possession of the firearm, *id.* § 7-2505.08(c), and failing to properly store the firearm, *id.* § 7-2507.02. Put differently, applicants with certain firearms-related infractions or misdemeanors may successfully obtain a registration certificate if they satisfy the District's remaining requirements.

Once a person submits a registration application, the Chief of Police makes a preliminary merits determination. If it "appears" to the Chief of Police that he should deny the request, he must "notify the applicant . . . of the proposed denial" and his grounds for denying the application. *Id.* § 7-2502.10(a). The applicant may then submit additional evidence for the Chief of Police to

consider before making a final decision. *Id.* An unsuccessful applicant may appeal the final denial to the D.C. Office of Administrative Hearings ("OAH"), *id.* § 7-2502.10(b), (b-1), and then to the D.C. Court of Appeals, *id.* § 2-1831.16(e), *see id.* § 2-1831.03(b-2)(2).

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Following an August 2016 bench trial before Magistrate Judge Thomas M. DiGirolamo in the U.S. District Court for the District of Maryland, Mr. Dotson was convicted of unlawful possession of a controlled substance, 36 C.F.R. § 2.35(b)(2), and possession of a loaded firearm in a motor vehicle, *id.* § 2.4(c), on National Park Service land. ECF No. 22-1, at 2 ¶ 6;[2] ECF No. 25-1 ¶¶ 8-10; *see* Aug. 10, 2016 Docket Entry, *United States v. Dotson*, No. 15-MJ-1689 (D. Md.).[3] At sentencing, Judge DiGirolamo reviewed the trial testimony that led him to find beyond a reasonable doubt that Mr. Dotson had committed both offenses. Nov. 16, 2016 Sentencing Hr'g at 11:36:48-11:39:08. The court relies on the parties' undisputed material facts and

[2] The citations to ECF No. 22-1 refer to the CM/ECF-generated page numbers at the top of each page rather than any internal pagination.

[3] The court takes judicial notice of the docket and the audio recordings from the August 25, 2026 bench trial and November 16, 2016 sentencing in Mr. Dotson's federal criminal case. *See* Fed. R. Evid. 201(b) (permitting a court to judicially notice "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 72 n.2 (D.D.C. 2023) (resolving cross-motions for summary judgment and taking judicial notice of a transcript from the oral ruling in another district court case); *cf. Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("[I]t is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." (alteration in original) (quoting *Fletcher v. Evening Star Newspaper Co.*, 133 F.2d 395, 395 (D.C. Cir. 1942))); *accord United States v. Johnson*, 911 F.3d 1062, 1065 n.1 (10th Cir. 2018) (taking judicial notice of a sentencing hearing recording); *Pathward Nat'l Assoc. v. Dot Dot Smile, LLC*, No. 24-CV-525, 2024 WL 4834950, at *1 n.2 (C.D. Cal. Sep. 12, 2024) (taking judicial notice of audio recordings from separate state court proceedings where both parties referenced those proceedings in their filings).

Judge DiGirolamo's factual findings supporting the guilty verdict and Mr. Dotson's sentence, which the court has judicially noticed. *See supra* n.3.

In August 2015, Mr. Dotson was the front-row passenger in a vehicle that was both speeding and weaving on Suitland Parkway in Maryland. Nov. 16, 2016 Sentencing Hr'g at 11:36:48-11:39:08; ECF No. 22-1, at 1 ¶ 4; ECF No. 25-1 ¶ 3. Suitland Parkway is a nine-mile stretch of highway in Maryland that is administered by the U.S. National Park Service and therefore falls under the U.S. Park Police's jurisdiction. ECF No. 22-1, at 1 ¶ 4; ECF No. 25-1 ¶ 3; *see* ECF No. 22-3, at 9, 41; *Suitland Parkway*, Nat'l Park Serv.[4] As officers pulled the car over to conduct a traffic stop, they observed Mr. Dotson leaning from the front-row passenger seat toward the driver's seat for approximately ten to fifteen seconds. Nov. 16, 2016 Sentencing Hr'g at 11:36:48-11:39:08; ECF No. 25-1 ¶ 4. Judge DiGirolamo found beyond a reasonable doubt that when Mr. Dotson was leaning over, he was placing a handgun beneath the driver's seat. Nov. 16, 2016 Sentencing Hr'g at 11:45:55-11:46:10.

Law enforcement officers ordered the driver and Mr. Dotson out of the vehicle, and they conducted a search. *Id.* at 11:36:48-11:39:08; ECF No. 22-1, at 1 ¶ 5; ECF No. 25-1 ¶ 6. In the vehicle, the officers discovered a loaded handgun under the driver's seat and an extended magazine. Nov. 16, 2016 Sentencing Hr'g at 11:36:48-11:39:08; ECF No. 25-1 ¶ 6. The officers also found marijuana in Mr. Dotson's possession. ECF No. 22-1, at 2 ¶ 5; ECF No. 25-1 ¶ 6. At the time of his arrest, Mr. Dotson was on probation for a 2014 conviction in the District of Columbia for

[4] *Available at* https://perma.cc/AN7A-L8Q5. The court takes judicial notice of the National Park Service's online description of Suitland Parkway. *See Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (explaining that courts in this district "have frequently taken judicial notice of information posted on official public websites of government agencies" and collecting cases).

unlawful possession of an unregistered firearm, which is a misdemeanor under District law. *See* ECF No. 22-1, at 2 ¶ 11, 4; ECF No. 25-1 ¶ 24; Nov. 16, 2016 Sentencing Hr'g at 11:39:20-11:40:30. Mr. Dotson asserts that this 2014 conviction was set aside under the District's Youth Rehabilitation Act ("YRA"), D.C. Code § 24-901 *et seq.*, but he does not indicate when it was set aside, *see* ECF No. 22-1, at 2 ¶ 11; ECF No. 22-3, at 5; ECF No. 25, at 23 & n.8.

When evaluating what sentence to impose, Judge DiGirolamo considered Mr. Dotson's commission of a weapons offense while on probation for another weapons offense—in violation of the terms of Mr. Dotson's supervision—to be the most important factor in his decision. Nov. 16, 2016 Sentencing Hr'g at 11:45:08-11:46:35; *see* D.C. Code § 24-906(f) (providing that a "conviction set aside under" the YRA may be used when "determining an appropriate sentence if the person is subsequently convicted of another crime"). Judge DiGirolamo accordingly sentenced Mr. Dotson to eighteen months of probation for the marijuana offense and ninety days of imprisonment for his unlawful possession of the firearm. Nov. 16, 2016 Sentencing Hr'g at 11:46:35-11:47:25.

In December 2023, Mr. Dotson applied for a firearm registration certificate and a concealed-carry license in the District of Columbia. ECF No. 22-1, at 2 ¶ 7; ECF No. 25-1 ¶ 1; ECF No. 25-3, at 2-3; ECF No. 25-4, at 2-4. He sought to "register [the] handgun for personal protection." ECF No. 22-1, at 2 ¶ 7; ECF No. 5-2 ¶ 8. On both application forms, in response to a question asking if he had ever been convicted of a "weapons offense," he answered "No." ECF ECF No. 25-3, at 2; ECF No. 25-4, at 2; *see* ECF No. 22-1, at 2 ¶ 9; ECF No. 25-1 ¶ 20. In January 2024, MPD denied both applications, explaining that Mr. Dotson's 2016 conviction for possession of a loaded firearm in a vehicle disqualified him from registering a firearm. ECF No. 5-4, at 3-5; *see* ECF No. 22-1, at 2 ¶ 8; ECF No. 25-1 ¶¶ 15-16. The denials did not provide

any additional bases for rejecting the applications. *See* ECF No. 5-4, at 3-5; ECF No. 25-1 ¶ 17. Mr. Dotson appealed, but MPD's Acting Director of the Records Division affirmed the denials in January 2024. ECF No. 5-4, at 1-2; ECF No. 22-1, at 2 ¶ 8. The Acting Director reiterated that Mr. Dotson's 2016 conviction "disqualifie[d] [him] from firearm registration pursuant to [Section] 7-2502.03(a)(2)," and further explained that the "evidence" Mr. Dotson had submitted indicated that "the appeal [of his conviction] was closed, not the conviction [itself]." ECF No. 5-4, at 1. Mr. Dotson appealed the denials to OAH. ECF No. 25-1 ¶ 18; *see* ECF No. 25-10.

In June 2024, Mr. Dotson filed suit in this court. ECF No. 1. He brought both a facial and an as-applied challenge to D.C. Code § 7-2502.03(a)(2), arguing that the statute is unconstitutional in light of the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and *New York Pistol & Rifle Association v. Bruen*, 597 U.S. 1, 17 (2022). ECF No. 1 ¶¶ 3, 5. Mr. Dotson seeks declaratory, injunctive, and compensatory relief. *Id.* at 14. Less than a week later, he moved for a preliminary injunction to prohibit the District from enforcing Section 7-2502.03(a)(2) against him. ECF No. 5.

On the same day that the District filed its opposition to the motion for a preliminary injunction, MPD sent Mr. Dotson two emails (one for each application) providing an additional reason for the denials. ECF No. 22-1, at 2 ¶ 9; ECF No. 25-1 ¶ 20; ECF Nos. 11-10, 11-11, 25-8, 25-9. According to MPD, Mr. Dotson's OAH appeals had "prompted further review of [his] application[s]" and revealed that he had "misrepresented [his] criminal history" by answering "No" to the weapons-offense question on both applications. ECF No. 25-8, at 2; ECF No. 25-9, at 2. MPD further explained: "[M]isrepresentations on an application are an independent ground for a denial. Accordingly, the Firearms Registration Branch is notifying you that your application for a firearm registration certificate is denied on the ground that it contained material misrepresentations." ECF

No. 25-8, at 2 (citing 24 DCMR § 2337.6 and D.C. Code §§ 7-2502.05(a), 7-2502.07(a)); *see* ECF No. 25-9, at 2 (similar). Mr. Dotson internally appealed this second set of denials to MPD's Records Division, ECF Nos. 18-1, 18-2, and supplemented his appeal at OAH, ECF No. 25-10; *see* ECF No. 25-1 ¶ 21. Upon Mr. Dotson's request, OAH stayed the administrative proceedings pending the outcome of this case. *See* ECF No. 25-11.[5]

In October 2024, Mr. Dotson submitted a new firearm registration application in which he truthfully reported the existence of his 2016 federal weapons-offense conviction. ECF No. 15-3 ¶ 3; ECF No. 22-1, at 2 ¶ 10; ECF No. 25-1 ¶ 23. Two months later, MPD denied the new registration application based on Mr. Doston's 2014 District of Columbia conviction for unlawful possession of an unregistered firearm. ECF No. 22-1 at 2 ¶ 11; ECF No. 25-1 ¶ 24. MPD's Firearms Registration Branch indicated that the 2014 sentence was imposed pursuant to the YRA. *See* ECF No. 22-1, at 4. Mr. Dotson did not appeal the denial of his October 2024 application to MPD or OAH, ECF No. 22-1, at 3 ¶ 12; ECF No. 25-1 ¶ 25, and he did not amend his complaint to raise allegations concerning the denial of this application.

Mr. Dotson has filed a motion seeking partial summary judgment on his requests for declaratory and permanent injunctive relief concerning his application to register a firearm, but he concedes that his claims for nominal and compensatory damages are not ripe. ECF No. 22, at 1. Although Mr. Dotson asserted both facial and as-applied challenges in his complaint, ECF No. 1 ¶¶ 3, 14; *see id.* at 13-14 (seeking declaratory judgment that the District's law is unconstitutional

---

[5] The court takes judicial notice of Mr. Dotson's OAH filing, ECF No. 25-10, and the OAH Administrative Law Judge's January 2025 order, ECF No. 25-11, to the extent those documents show that Mr. Dotson appealed the denials of his applications to OAH and that the appeal is currently stayed. *See* Fed. R. Evid. 201; *see also Ashbourne v. Hansberry*, 245 F. Supp. 3d 99, 103 (D.D.C. 2017) (describing the types of "public documents" from agency proceedings that the court can judicially notice).

facially and as applied to him), at this stage in the litigation, he asks only for "summary judgment on his claims . . . [concerning the] enforcement of the weapons offense prohibitor against him," ECF No. 22-3, at 43; *see generally* ECF Nos. 22, 29 (failing to raise a facial challenge to the weapons-offense bar). The District has filed a cross-motion for summary judgment. ECF No. 25. Both motions are fully briefed, ECF Nos. 22, 25, 26, 29, 30, 32, and the parties have filed notices of supplemental authority, ECF Nos. 31, 33 to 36. In March 2026, the court stayed the case pending the Supreme Court's decision in *United States v. Hemani*, 608 U.S. 772 (2026). *See* ECF No. 37. After the Court issued *Hemani* and *Wolford v. Lopez*, 609 U.S. 185 (2026), the court directed the parties to file supplemental briefs, June 29, 2026 Minute Order, and the parties complied, ECF Nos. 39, 40.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see* Fed. R. Civ. P. 56(a). A material fact is one which "might affect the outcome of the suit under the governing law," and a "dispute about a material fact is 'genuine'" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to

find in its favor, *see Liberty Lobby*, 477 U.S. at 248-49 (1986); *see also Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015).

When parties file cross-motions for summary judgment, each motion is viewed separately in the light most favorable to the nonmoving party, with the court "determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 (3d ed. 2016)); *see Fox v. Transam Leasing, Inc.*, 839 F.3d 1209, 1213 (10th Cir. 2016); *Pac. Indem. Co. v. Deming*, 828 F.3d 19, 23 (1st Cir. 2016).

## IV. DISCUSSION

In their cross-motions for summary judgment, the parties raise two issues. First, the District raises a threshold argument, asking the court to deny Mr. Dotson's request for a permanent injunction because Mr. Dotson has "fail[ed] to address all injunctive factors in his opening brief." ECF No. 25, at 6. Second, Mr. Dotson contends that the District's weapons-offense bar is unconstitutional as applied to him, whereas the District defends its weapons-offense bar as consistent with *Heller* and *Bruen*. The court addresses each argument in turn.

### A. Permanent Injunctive Relief

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156 (2010) (alteration in original) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). He must demonstrate: (1) "that [he] has suffered an irreparable injury"; (2) "that remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "that, considering the balance of hardships between the plaintiff and defendant, a remedy in

equity is warranted"; and (4) "that the public interest would not be disserved by a permanent injunction." *Id.* at 156-57 (quoting *eBay Inc.*, 547 U.S. at 391); *see Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 93-115 (D.D.C. 2025) (applying the four-factor test to constitutional claims). "When the defendant is the government," the third and fourth factors "merge." *Anatol Zukerman & Charles Krause Reporting, LLC v. U.S. Postal Serv.*, 64 F.4th 1354, 1364 (D.C. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

A court only enters a permanent injunction "after [a] final decision on the merits." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). But because "[a]n injunction is a matter of equitable discretion," it "does not follow from success on the merits as a matter of course." *Id.*; *see Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *see also Sidak v. U.S. Int'l Trade Comm'n*, 174 F.4th 151, 159-60 (D.C. Cir. 2026) (explaining that a district court's decision to issue an injunction is reviewed for abuse of discretion); *N.S. v. Dixon*, 141 F.4th 279, 286 (D.C. Cir. 2025) (same). That "discretion is necessarily broad and a strong showing of abuse must be made to reverse it." *Anatol Zukerman & Charles Krause Reporting, LLC*, 64 F.4th at 1364 (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953)).

"Because courts are 'essentially passive instruments of government,' [the parties must] 'frame the issues for decision.'" *Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339, 342 (2026) (per curiam) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020)). A party thus forfeits an argument by failing to raise it. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 6 (D.C. Cir. 2019). The District argues that Mr. Dotson has forfeited his request for a permanent injunction by not addressing the four-factor test in his summary judgment briefing. ECF No. 25, at 6; ECF No. 32, at 2-3; *see* ECF No. 22; *see also Monsanto Co.*, 561 U.S. at 156-57 (explaining

that a plaintiff seeking a permanent injunction bears the burden of demonstrating the four factors). Curiously, Mr. Dotson does not respond to the District's forfeiture argument in his reply brief. *See* ECF No. 29.

The court agrees that Mr. Dotson has forfeited his argument for a permanent injunction. While Mr. Dotson argues that he has Article III standing, ECF No. 22-3, at 6-8, he does not assert that his injury is irreparable, that any alternative remedy (like damages) would inadequately compensate him for his injury, or that the equities and public interest favor a permanent injunction, *see generally* ECF Nos. 22, 29. Nor does he explain why the court should exercise its discretion and grant him the relief of a permanent injunction. Mr. Dotson's failure to make these arguments dooms his claim for a permanent injunction. *Cf. Abdullah v. Obama*, 753 F.3d 193, 199-200 (D.C. Cir. 2014) (holding that a party forfeited his claim for preliminary injunctive relief by failing to address irreparable injury, the equities, and the public interest in his opening brief).

The District goes a step further, asking the court to deny Mr. Dotson's entire motion based on his failure to address the injunction factors. ECF No. 25, at 6. But Mr. Dotson also seeks partial summary judgment on his claim for declaratory relief, ECF No. 22, at 1, for which there are no additional factors beyond the merits. Accordingly, the court will deny Mr. Dotson's partial motion for summary judgment as it concerns the request for a permanent injunction, but the court finds no basis on which to deny his entire motion.

## B. The Second Amendment

### 1. The *Bruen* framework

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has interpreted the Second Amendment's text to confer "an

individual right to keep and bear arms for self-defense." *Bruen*, 597 U.S. at 17; *see Heller*, 554 U.S. at 592. "Like most rights, the right secured by the Second Amendment is not unlimited." *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 626). In *Bruen*, the Supreme Court clarified the scope of conduct that may be regulated consistent with the Second Amendment, putting an end to the two-step framework that federal courts had been applying in the years following *Heller* and *McDonald v. Chicago*, 561 U.S. 742 (2010).

Under that earlier framework, if historical evidence established that the challenged law regulated conduct outside the original scope of the Second Amendment right, courts held that the conduct was not protected. *Bruen*, 597 U.S. at 18. But if the historical evidence was unclear or suggested that the conduct was not categorically unprotected, courts would weigh the law's burden against the benefit it offered. *Id.* at 18-19. Any law burdening "a 'core' Second Amendment right" required courts to "apply 'strict scrutiny' and ask whether the Government can prove that the law is 'narrowly tailored to achieve a compelling governmental interest.'" *Id.* at 18-19 (quoting *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017)). In *Bruen*, the Supreme Court rejected this framework, clarifying that *Heller*'s and *McDonald*'s methodology centered on constitutional text and history and "did not invoke any means-end test such as strict or intermediate scrutiny" or any "'interest-balancing inquiry.'" *Id.* at 22 (quoting *Heller*, 554 U.S. at 634). Instead, the Court explained that "the standard for applying the Second Amendment is as follows:"

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961).

Following *Bruen*, courts conduct a different two-step inquiry. The court must first ask whether the "challenged law fall[s] within the plain text of the Second Amendment," *Wolford*, 609 U.S. at 201-02, which turns on "three subsidiary questions": (1) whether the law "appl[ies] to 'the people' . . . which [includes] 'all members of the political community,'" *id.* at 195 (quoting *Heller*, 554 U.S. at 580); (2) whether the law regulates "any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes," *id.* (citing *Heller*, 554 U.S. at 584); and (3) whether the law "place[s] any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying)" of those arms, *id.* (second and third alterations in original) (citing *Bruen*, 597 U.S. at 32-33). If the challenged law meets all three criteria, "the Constitution presumptively protects that conduct," *Bruen*, 597 U.S. at 17, and the court proceeds to *Bruen*'s second step and considers whether the law "violate[s] the preexisting right that the Amendment codified," *Wolford*, 609 U.S. at 196. But if the Second Amendment does not cover the individual's conduct, "the constitutional inquiry ends" at *Bruen*'s first step "and a plaintiff's challenge to the law fails." *Giambalvo v. Suffolk County*, 155 F.4th 163, 176 (2d Cir. 2025).

At *Bruen*'s second step, the "government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. For some firearm regulations, the historical inquiry is "straightforward." *Id.* at 26. But when confronted with "present-day" regulations "that were unimaginable at the founding," the inquiry "often involve[s] reasoning by analogy." *Id.* at 28. When "evaluating proffered analogues," a court should consider "the number of jurisdictions in which they were adopted" and "the extent to which they were well-accepted." *Wolford*, 609 U.S. at 196. The court should also assess "whether any analogue or collection of analogues is 'relevantly similar' to the modern law." *Id.* (quoting *Bruen*, 597 U.S. at 29). The Court has declined to "provide an exhaustive survey of the features

that render [modern] regulations relevantly similar under the Second Amendment" to historical analogues, but it has identified two important metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29; *accord Hemani*, 608 U.S. at 780; *see Hanson v. District of Columbia*, 120 F.4th 223, 234-35 (D.C. Cir. 2024) ("We think the appropriate level of generalization is one that aligns the regulation in question with the 'how' and 'why' of the historical analogue." (quoting *Bruen*, 597 U.S. at 30)). In other words, the court must assess "whether modern and historical regulations impose a comparable burden" on the Second Amendment right "and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. "[A]nalogical reasoning . . . is neither a regulatory straightjacket nor a regulatory blank check," and to survive a Second Amendment challenge, the government must only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30.

The Court has applied its history-and-tradition test three times since *Bruen*. In *United States v. Rahimi*, 602 U.S. 680 (2024), the Court rejected both facial and as-applied challenges to 18 U.S.C. § 922(g)(8), which criminalizes possession of a firearm by anyone subject to a qualifying domestic violence restraining order. 602 U.S. at 693-702. In resolving the constitutional challenge, the Court in *Rahimi* admonished that "some courts ha[d] misunderstood the methodology" from *Heller*, *McDonald*, and *Bruen* by requiring the government to show too close a fit between a current regulation and a historical analogue to survive Second Amendment scrutiny. *Id.* at 691. "These precedents," the Court explained, "were not meant to suggest a law trapped in amber." *Id.* A challenged regulation need only be "consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added); *see Hemani*, 608 U.S. at 780. "Why and how the regulation burdens the [Second Amendment] right are central to [the court's] inquiry." *Rahimi*, 602 U.S. 692. Applying that framework, the Court held that two historical analogues—

surety laws and prohibitions on "going armed," *id.* at 697-99—when "[t]aken together," supported disarming an individual who a court has determined "poses a clear threat of physical violence to another," *id.* at 698; *see id.* ("Section 922(g)(8) is 'relevantly similar' to those founding era regimes in both why and how it burdens the Second Amendment right." (quoting *Bruen*, 597 U.S. at 29)). The Court also acknowledged that, had Mr. Rahimi complied with Section 922(g)(8), his disarmament would have been "temporary," because the law only applies "so long as the defendant 'is' subject to a restraining order." *Id.* at 699 (quoting 18 U.S.C. § 922(g)(8)).

The Court's second post-*Bruen* case, *Hemani*, involved a challenge to Section 922(g)(3), which prohibits firearm possession by anyone "who is an unlawful user of or addicted to any controlled substance." 18 U.S.C. § 922(g)(3); *Hemani*, 608 U.S. at 777-79. Prosecutors charged Mr. Hemani under Section 922(g)(3) after police executed a warrant at his home, during which he "surrendered a gun" and told officers "that he used marijuana about every other day." *Hemani*, 608 U.S. at 778. Mr. Hemani asserted an as-applied Second Amendment challenge to the indictment. *Id.* at 779. The Court held that Section 922(g)(3) was unconstitutional as applied to Mr. Hemani and rejected the United States' argument that historical "habitual drunkard" laws satisfied the history-and-tradition test. *Id.* at 779-83. As the Court explained, those laws failed both the "'why' and 'how'" metrics, *id.* at 780 (quoting *Bruen*, 597 U.S. at 29), used to compare historical analogues and modern regulations because the habitual drunkard laws "targeted different kinds of people, did so for different purposes, and operated in different ways" than Section 922(g)(3), *id.* at 783.

Finally, in *Wolford*, the Court considered a challenge to a Hawaii statute that set a default rule prohibiting any person from carrying a firearm onto another person's private property without prior authorization from the property owner, lessee, operator, or manager. 609 U.S. at 198-201. Both the district court and the Ninth Circuit declined to enjoin enforcement of the law with respect

to private property that was closed to the public, but the Ninth Circuit reversed the district court's injunction as to private property held open to the public. *Id.* at 201. The Supreme Court struck down the law in its entirety. *Id.* at 212. At *Bruen*'s first step, the Court held that the law burdened the challengers' Second Amendment right by requiring permit holders "to somehow obtain permission to carry a firearm on the property before stepping foot on it." *Id.* at 202. At step two, the Court rejected Hawaii's argument that the state had a longstanding tradition of prohibiting private possession of firearms because "the Second Amendment has the same meaning in all parts of the United States" and cannot be subverted by "local attitudes." *Id.* at 206. Finally, the Court concluded that Hawaii's historical analogues—which "consist[ed] almost entirely of laws that prohibited unauthorized hunting of deer or small game on someone else's private property"—were dissimilar in purpose and scope to Hawaii's default property rule. *Id.* at 208.

**2. Applying the *Bruen* framework**

In their cross-motions for summary judgment, the parties dispute how the District's weapons-offense bar fares at both steps of *Bruen*'s history-and-tradition test. *See generally* ECF Nos. 22, 25, 29, 32. But the District acknowledges in its supplemental brief that the court can "avoid questions about the proper scope of [*Bruen*] step one by assuming without deciding" that Mr. Dotson's proposed conduct—registering a firearm for self-defense despite his prior convictions for weapons offenses—is covered by the Second Amendment's plain text. ECF No. 39, at 10. The court agrees with that approach and will largely focus its analysis on the second step of *Bruen*'s analysis.

*a.* Bruen*'s first step*

Resolving the first step of the *Bruen* analysis presents a close question. The District correctly notes that the Supreme Court has described felon-in-possession statutes as "presumptively" constitutional. *Heller*, 554 U.S. at 627 n.26; *see* ECF No. 25, at 7. And the D.C. Circuit has rejected an as-applied challenge to the federal felon-in-possession law. *Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (holding that "non-dangerous felons [do not] have a right to bear arms," so the government can disarm "unpardoned convicted felons" on a class-wide basis). Although *Medina* was decided when the D.C. Circuit still employed the pre-*Bruen* means-end scrutiny for Second Amendment challenges, *see id.* at 157, it remains good law after *Bruen*. That is because *Medina* "did not rely on interest balancing" and instead "'look[ed] to tradition and history,' including 'the public understanding of the right at th[e] time' of ratification 'to determine if a convicted felon would fall outside the scope of [the Second Amendment's] protection.'" *United States v. Griffith*, No. 25-3023, 2026 WL 2211012, at *2 (D.C. Cir. July 31, 2026) (per curiam) (alterations in original);[6] *cf. United States v. Johnson*, 158 F.4th 200, 209 (D.C. Cir. 2025) (concluding, on plain-error review, that *Bruen* did not "'obvious[ly]' . . . disturb[] *Medina*"). Indeed, the *Medina* Court's inquiry is the same one that "*Bruen* endorsed" as "'broadly consistent with *Heller*.'" *Johnson*, 158 F.4th at 209 (quoting *Bruen*, 597 U.S. at 19). The D.C. Circuit's recent decision in *United States v. Richardson*, No. 24-3151, 2026 WL 2451537 (D.C. Cir. Aug. 21, 2026), does not alter the court's conclusion

---

[6] While *Griffith* is an unpublished and therefore non-binding opinion, the court finds it persuasive because its assessment of *Medina* is consistent with *Heller* and the first step of the *Bruen* inquiry. *See In re Grant*, 635 F.3d 1227, 1232 (D.C. Cir. 2011) (explaining that unpublished opinions have less precedential value than the Circuit's published opinions, but that unpublished decisions "may be considered persuasive authority").

that *Medina* is consistent with *Bruen*. There, the D.C. Circuit resolved the narrow question whether the federal felon-in-possession statute is "constitutional as applied to felons who are still under supervision as part of a criminal sentence at the time of their [Section] 922(g)(1) offense." *Id.* at *1. The D.C. Circuit expressly "assume[d] that *Medina* d[id] not resolve th[e] case" and decided only that the challenged law fell within the historical tradition of firearm regulation. *Id.* at *3.

The District does not contend that Mr. Dotson has been convicted of a felony, *see* ECF No. 25-1, so neither *Heller* nor *Medina* squarely answers the specific *Bruen* step-one question here: whether Mr. Dotson, who has two misdemeanor convictions for weapons offenses, is among "the people" protected by the Second Amendment.[7] The *Heller* Court did not purport to offer an "exhaustive" list of "presumptively lawful" firearms regulations, 554 U.S. at 626-27 & n.26; *see* ECF No. 25, at 7, so the District contends that the "'logic'" of *Heller* and *Medina* "should apply to at least some misdemeanants," including those like Mr. Dotson who have been convicted of misusing firearms, ECF No. 25, at 11 (quoting *United States v. Shaw*, No. 22-CR-1, 2023 WL 3619416, at *7 (D.D.C. May 24, 2023)). The court refrains from making that logical leap for three reasons.

First, the Supreme Court in *Wolford* explained that when considering the Second Amendment's plain text, a court must "determine" whether the challenged law "appl[ies] to 'the people,'" which includes "'all members of the political community.'" 609 U.S. at 195 (quoting *Heller*, 554 U.S. at 580). The District contends that *Wolford* does not help Mr. Dotson's

---

[7] The District does not contest the other "subsidiary questions" at the first step of the *Bruen* inquiry—whether the firearm Mr. Dotson tried to register is a "weapon customarily used for offensive or defensive purposes" or whether the weapons-offense bar restricts the "possession" or "carrying" of "arms." *Wolford*, 609 U.S. at 195; *see* ECF Nos. 25, 32, 39.

*Bruen* step-one argument because Hawaii never asserted that the parties challenging its law were not "among 'the people' protected by the Second Amendment." *Id.* at 202; *see* ECF No. 39, at 10. That may be true, but as the en banc Third Circuit recently explained, *Wolford* appears to supply the relevant analytical question for who counts among "the people." *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Atty. Gen. N.J.*, 183 F.4th 211, 230-31 (3d Cir. 2026) (en banc). At the very least, the Court's focus in *Wolford* on "the political community" as the group of people plainly covered by the Second Amendment raises the question why Mr. Dotson's misdemeanor convictions would be enough to exclude him from the scope of the Second Amendment's protection at step one in the *Bruen* inquiry.

Next, it is not sufficiently clear whether *Medina*'s holding bears on *Bruen*'s first or second step. To be sure, in *Medina*, the D.C. Circuit concluded that "convicted felons are excluded from the scope of the Second Amendment," 913 F.3d at 161, but it reached that conclusion at the first step of the interest-balancing analysis that *Bruen* has now foreclosed, *see id.* at 160. At that step, courts determined whether "the challenged law regulates conduct 'outside the Second Amendment's protections'" before turning to means-ends scrutiny at step two. *Id.* at 156 (quoting *Schrader v. Holder*, 704 F.3d 980, 988-89 (D.C. Cir. 2013)). The *Medina* Court's consideration of history at the first step of the now-rejected interest-balancing framework does not answer whether the *Medina* Court viewed "tradition and history," *id.* at 158, as helpful in interpreting the Second Amendment's plain text (*Bruen* step one) or the historical tradition of firearms regulation (*Bruen* step two). "[T]ogether, [*Bruen*'s] two steps illuminate the original scope of the right," *Wolford*, 609 U.S. at 213 (Barrett, J., concurring), so the *Medina* Court's discussion about the "scope" of the Second Amendment does not obviously apply to step one, 913 F.3d at 158-60. Indeed, none of the D.C. Circuit's post-*Bruen* cases provide clarity on where

*Medina* fits into the analysis. *See Richardson*, 2026 WL 2451537, at *3; *Griffith*, 2026 WL 2211012, at *2; *Johnson*, 158 F.4th at 208-10; *Hanson*, 120 F.4th at 232-34. And other federal appellate courts have held that convicted felons are protected by the Second Amendment's plain text at *Bruen*'s first step but that felon-in-possession laws survive Second Amendment scrutiny at *Bruen*'s second step. *See, e.g.*, *Zherka v. Bondi*, 140 F.4th 68, 75-77 (2d Cir. 2025); *United States v. Diaz*, 116 F.4th 458, 466-71 (5th Cir. 2024); *United States v. Williams*, 113 F.4th 637, 648-62 (6th Cir. 2024); *United States v. Duarte*, 137 F.4th 743, 752-55 (9th Cir. 2025); *cf. United States v. Watson*, 171 F.4th 1012, 1018 (7th Cir. 2026) (explaining that the question whether convicted felons are among the "people" is "difficult" and relying on *Heller* to conclude that felons fall within the scope of the Second Amendment); *Kanter v. Barr*, 919 F.3d 437, 451-53 (7th Cir. 2019) (Barrett, J., dissenting) (concluding that those convicted of felonies "fall[] within the scope of the Second Amendment" but that "history and tradition support Congress's power to strip" them of their right to keep and bear arms). *But cf. United States v. Hunt*, 123 F.4th 697, 704-05 (4th Cir. 2024) (concluding that pre-*Bruen* Circuit precedent foreclosed an as-applied challenge, but that under *Bruen*, the discussion in *Heller* about "presumptively lawful" statutes restricting firearm possession to law-abiding citizens warranted rejecting the argument that convicted felons are protected by the Second Amendment's plain text).

Finally, even if *Heller*'s discussion of "presumptively lawful" regulations and *Medina*'s holding about felon-in-possession statutes indisputably applied at *Bruen*'s first step, it is not clear whether those decisions would cut in the District's favor here *at step one* given the inquiry's focus on "the people" in the political community and the fact that Mr. Dotson has two misdemeanor—rather than felony—convictions. *See Fla. Comm'r of Agric. v. Att'y Gen. of U.S.*, 148 F.4th 1307, 1317 (11th Cir. 2025) ("The parties do not cite, and we are not aware of, any authority for the

proposition that misdemeanants are not among the people who enjoy the right to bear arms as protected by the Second Amendment."). While the D.C. Circuit has not expressly considered the question, other federal appellate courts have concluded that those convicted of misdemeanor crimes of domestic violence are among "the people" described by the Second Amendment. *See, e.g.*, *United States v. Allred*, 182 F.4th 448, 451 (5th Cir. 2026) (noting that the government must prevail at *Bruen* step two to survive a challenge to Section 922(g)(9), which applies to someone "convicted in any court of a misdemeanor crime of domestic violence"); *United States v. Gailes*, 118 F.4th 822, 826 (6th Cir. 2024) (similar).

Given these unresolved methodological questions, the court will assume that the District's weapons-offense bar regulates any Second Amendment right that Mr. Dotson enjoys and determine at *Bruen*'s second step whether the law is consistent with the historical tradition of firearm regulations. *See Hanson*, 120 F.4th at 230, 233 ("presum[ing]" that "extra-large capacity magazine[s]" can "be used for self-defense" and thus are "presumptively protect[ed]" by the Second Amendment); *see also Frey v. City of New York*, 157 F.4th 118, 131 (2d Cir. 2025) (assuming without deciding that the district court had correctly determined that the plaintiffs satisfied *Bruen*'s first step); *Barnett v. Raoul*, 180 F.4th 1035, 1046 (7th Cir. 2026) (assuming that the regulated weapons were "Arms" under the Second Amendment and "mov[ing] to *Bruen*'s second step"); *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) ("We assume, without deciding, that step one of the *Bruen* test is met[,] [b]ut we find [the regulation] constitutional under step two[.]"); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1130 (11th Cir. 2025) (assuming in a challenge to a law prohibiting possession of firearms by people under the age of twenty-one that those individuals "are part of 'the people' protected by the Second Amendment"). *But cf. Beckwith v. Frey*, 171 F.4th 560, 566 (1st Cir. 2026) (agreeing with the government that the challenged

firearms law could "be addressed at [*Bruen*] step one" and declining to "consider whether the [district] court erroneously conducted the historical analogue analysis"); *Gailes*, 118 F.4th at 826 ("[C]ourts proceed to *Bruen*'s second step only if the Second Amendment covers the conduct at issue.").[8]

*b.* Bruen*'s second step*

Neither party has identified a historical twin for the District's weapons-offense bar at *Bruen*'s second step, but that does not render the regulation unlawful. The court will decide this "case[] 'based on the historical record' and arguments 'compiled by the parties' before [it].'" *Hemani*, 608 U.S. at 783 (quoting *Bruen*, 597 U.S. at 26 n.6). Accordingly, the court turns to the historical analogues that the District has offered and considers whether the principles underpinning those analogues are consistent with applying the weapons-offense bar to Mr. Dotson. *See Rahimi*, 602 U.S. at 692. In doing so, the court focuses on Mr. Dotson's federal firearms conviction because "Mr. Dotson focuses his as-applied challenge" on the MPD's denial of his registration

[8] Before resolving the parties' dispute at *Bruen*'s second step, the court makes a final observation. As the court has noted, Mr. Dotson applied twice to register a firearm. *See supra* Section II. In his first application, Mr. Dotson incorrectly stated that he did not have a prior weapons-offense conviction, and MPD denied his application due to his 2016 conviction for unlawful possession of a firearm in the District of Maryland. During the administrative appeal of that decision, MPD stated that Mr. Dotson's misrepresentation about his conviction was an independent basis to deny his application. *See supra* pp. 6-7. In his second application, Mr. Dotson truthfully disclosed his 2016 conviction, but MPD denied the application due to Mr. Dotson's 2014 conviction for unlawful possession of a firearm in the Superior Court of the District of Columbia. *See supra* p. 7. The District has represented in this litigation that "whether MPD can deny a successive application for a prior misrepresentation is—at best—an open question." ECF No. 17, at 7. The court need not consider that argument or the related question whether a person's alleged dishonesty in submitting a firearm registration application sufficiently indicates that he presents a risk of firearm misuse.

application on that ground, ECF No. 25, at 4 n.2, and the court considers both the nature of that conviction and the facts supporting the conviction and sentence.[9]

The District identifies two historical principles in support of its firearm regulation: that the government may disarm those who present a special risk of misusing firearms and those who fail to follow the law. In the District's view, those principles can be drawn from several historical analogues, including surety and going armed laws like those on which the Supreme Court relied in *Rahimi*; the consequences of a felony conviction at the founding and firearm forfeiture under other criminal statutes; disarmament for those who did not comply with "less formal legal norms"; laws prohibiting firearm possession by certain "classes" of people, including "Native Americans,

---

[9] "Thoughtful jurists have differing views on the scope of materials relevant to as-applied challenges to gun restrictions." *Richardson*, 2026 WL 2451537, at *6. Some courts resolving challenges to Section 922(g)(1), the federal felon-in-possession statute, have considered "all record evidence about the defendant, including facts bearing on his dangerousness." *Id.* (pointing to the Sixth Circuit's decision in *Williams*, 113 F.4th at 657-62, and the Third Circuit's decision in *United States v. Moore*, 111 F.4th 266, 272-73 (3d Cir. 2024)). "[O]thers consider only the prior predicate conviction and sentence." *Id.* (describing the Fifth Circuit's approach in *United States v. Mitchell*, 160 F.4th 169, 179 (5th Cir. 2025)). The D.C. Circuit has not clarified which approach courts in this district should follow. In *Richardson*, the Court explained that it was "consider[ing] the pertinent facts underlying [the defendant's] case" and cited *Williams* and *United States v. Veasley*, 98 F.4th 906, 909 (8th Cir. 2024), to support that approach. *Id.* at *5. *Williams* and *Veasley* support the more expansive view of what evidence a court should consider when resolving an as-applied challenge. *See Williams*, 113 F.4th at 657-62; *Veasley*, 98 F.4th at 909 (explaining that "[i]f a frail and elderly grandmother uses marijuana for a chronic medical condition a day before possessing a gun, for example, the constitutional analysis will consider . . . only those circumstances"). But the *Richardson* Court explained later in its opinion that it "need not resolve" which of the other Circuits' approaches is appropriate because the defendant's "prior conviction," which was in the record on appeal, and "sentence," which was "judicially noticeable," "suffice[d] to establish the constitutionality of [S]ection 922(g)(1) as applied" to him. 2026 WL 2451537, at *6. Here, the District has not offered evidence of Mr. Dotson's dangerousness or other relevant characteristics aside from the "pertinent facts underlying" his predicate conviction. *Id.* at *5. The court therefore takes a similar approach to the D.C. Circuit in *Richardson* and considers the nature of Mr. Dotson's underlying federal conviction and the judicially noticeable facts supporting the conviction and sentence. *See supra* pp. 3-6 and nn. 3-5.

enslaved persons, [and] religious minorities" seen as "dangerous" or to have "demonstrated disrespect for the law"; and licensing schemes. ECF No. 25, at 34-38. To ascertain whether the District has carried its burden, the court will assess the historical record that the District has marshalled, including evidence it offered at *Bruen*'s first step where it is relevant at *Bruen*'s second step. *See* ECF No. 39, at 10 (asserting that the court "could and should consider all the District's step one arguments under the banner of step two" if it "assum[ed] without deciding that step one is satisfied"). The court first considers the surety and going armed laws before turning to historical disarmament relating to criminal statutes and class-based prohibitions on firearm possession.[10] For both, the court will examine the relevant historical analogues and then assess the "[w]hy and how" metrics, *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 602 U.S. at 29), to compare the historical analogues to the District's weapons-offense bar.

---

[10] The court declines to consider the early American firearm licensing laws as potential historical analogues for the District's weapons-offense bar. *See* ECF No. 25, at 36-38. The District contends that because there is a historical tradition of lawful licensing schemes, and because licensing schemes eventually included weapons-offense bars, the District's regulation here is constitutional. *Id.* at 38 ("Bars on licensing individuals convicted of enumerated crimes, like the weapons offense bar, were among th[e] clearer standards [in licensing schemes]. Thus, . . . there is a historical throughline from early American firearm regulation to the law challenged here."). This logic would allow a government to impose any Second Amendment burden under the guise of a "licensing" law and escape constitutional scrutiny. In other words, the District's argument invites the wrong question. While several Justices on the Supreme Court have expressed the view that nondiscretionary, or so-called "shall-issue," licensing regimes are constitutional, *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring) (joined by Chief Justice Roberts), a licensing regime is made up of various related regulations, *see, e.g.*, *id.* at 12 (majority op.) (explaining that meeting the challenged "proper cause" standard was just one "among other things" that an applicant needed to do to successfully obtain a license). The relevant Second Amendment inquiry is whether the *specific* regulation in that scheme—here, the weapons-offense bar, or the "proper cause" standard in *Bruen*—is consistent with the historical tradition of firearm regulation. *Cf. id.* at 38 n.9 ("[B]ecause any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.").

i. Surety and going armed laws

*Historical analogues.* Surety and going armed laws were "two distinct legal regimes" dating to "the 1700s and early 1800s" that "specifically addressed firearms violence." *Rahimi*, 602 U.S. at 694-95. Under a surety law, a magistrate could "oblig[e] those persons, [of] whom there is a probable ground to suspect of future misbehaviour, to stipulate with and to give full assurance . . . that such offence . . . shall not happen[,] by finding pledges or securities." *Id.* at 695 (alterations in original) (quoting 4 W. Blackstone, Commentaries on the Laws of England ("Blackstone") 251 (10th ed. 1787)). "In other words, the law authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Id.* Individuals who "failed to post a bond" would "be jailed," and those who "did post a bond and then broke the peace" would "forfeit" their payment. *Id.*

Two types of surety laws existed in the founding era. First, sureties to guarantee the peace "could be invoked to prevent all forms of violence," including "the misuse of firearms." *Id.* at 695, 697. In contrast, "sureties of good behavior," *Hemani*, 608 U.S. at 789 (internal quotation marks omitted), permitted "a judicial officer [to] impose a surety . . . on individuals who threatened a 'scandal,'" *id.* (quoting J. Parker, Conductor Generalis 410 (1788)). Only surety-of-the-peace statutes are relevant here. The *Rahimi* Court pointed to a founding-era Massachusetts law "authorizing justices of the peace to 'arrest' all who 'go armed offensively [and] require of the offender to find sureties for his keeping the peace.'" 602 U.S. at 696 (alteration in original) (quoting 1795 Mass. Acts. ch. 2, in Acts and Resolves of Massachusetts, 1794-1795, ch. 26, pp. 66-67 (1896)). The Court further identified "[a]t least nine other jurisdictions [that] did the same." *Id.*; *see Bruen*, 597 U.S. at 56 & n.23 (collecting statutes).

Unlike surety laws, which *prevented* future violence or misbehavior, *see* 4 Blackstone 251 (explaining that "sureties . . . must be understood . . . as a caution against the repetition of the offence, [rather] than any immediate pain or punishment"), going armed laws "provided a mechanism for *punishing* those who had menaced others with firearms," *Rahimi*, 602 U.S. at 697 (emphasis added). Going armed laws were a "subset of the ancient common law prohibition on affrays," which "prototypical[ly] . . . involved fighting in public" but also "encompass[ed] the offense of 'arm[ing]' oneself 'to the Terror of the People.'" *Id.* (fourth alteration in original) (quoting T. Barlow, The Justice of the Peace: A Treatise 11 (1745)). For example, Kentucky "criminalized 'go[ing] with force and arms before courts,'" and "[t]hose who violated that law were required 'to forfeit their arms to the commonwealth,' and were 'fined and imprisoned at the discretion of a jury.'" *United States v. Moore*, 111 F.4th 266, 271 (3d Cir. 2024) (first alteration in original) (quoting Act of Dec. 19, 1801, § 33, *Collection of All the Public and Permanent Acts of the General Assembly of Kentucky*, at 360, 371 (Harry Toulmin ed., 1802)); *see* ECF No. 25, at 36 (describing Kentucky's law).

"Whether classified as an affray law or a distinct prohibition, the going armed laws prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.'" *Rahimi*, 602 U.S. at 697 (alterations in original) (quoting 4 Blackstone 149). These acts "disrupted the 'the public order' and 'le[d] almost necessarily to actual violence,'" and the law punished them with "'forfeiture of the arms . . . and imprisonment.'" *Id.* (alterations in original) (first quoting *State v. Huntly*, 25 N.C. 418, 421-22 (1843) (per curiam); then quoting 4 Blackstone 149). Riding or going armed with a dangerous weapon to terrify the public also resulted in forfeiture of a surety of the peace. *See* 4 Blackstone 255 (explaining that "any one of the . . . crimes against the public peace" would lead to forfeiture); 4 W. Blackstone, Commentaries

on the Laws of England 142, 149 (8th ed. 1778) (listing "riding or going armed" as crimes "against the public peace" (emphasis omitted)). Several states codified prohibitions on going armed and affrays, and elsewhere the prohibitions were "incorporated into American jurisprudence through the common law." *Rahimi*, 602 U.S. at 697; *see, e.g.*, *Antonyuk v. James*, 120 F.4th 941, 1037 (2d Cir. 2024) (pointing to "a 1786 Virginia law barring persons from go[ing] []or rid[ing] armed by night []or by day, in fairs or markets, or in other places, in terror of the county" (alterations in original) (internal quotation marks omitted)). Thus the North Carolina Supreme Court explained in 1843—in a case that the Supreme Court cited approvingly in *Rahimi*, 602 U.S. at 697—that the common-law "offence of riding or going armed with unusual and dangerous weapons, to the terror of the people" allowed any person "to carry his gun" for "any lawful purpose[,] either of business or amusement," but prohibited him from "carry[ing] about this [gun] or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm, a peaceful people," *Huntly*, 25 N.C. at 418, 423; *see Bruen*, 597 U.S. at 52 (taking from *Huntly* that "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so").[11]

*Comparing the "why" and the "how."* The surety and going armed laws "[t]aken together" allow the government to disarm someone who, based on his dangerous conduct, "present[s] a special danger of misus[ing]" firearms. *Rahimi*, 602 U.S. at 698; *see* ECF No. 25, at 34. The court

---

[11] In an earlier case, *Simpson v. Tennessee*, 13 Tenn. 356 (5 Yer. 356) (1833), the Tennessee Supreme Court reached "[a] different conclusion" and held that it was *not* unlawful "for a man to go armed in public places with dangerous and unusual weapons when there was no attempt to use them," *State v. Dawson*, 159 S.E.2d 1, 8 (N.C. 1968) (explaining the difference between *Huntly* and *Simpson*). The North Carolina Supreme Court concluded in *Dawson* that its earlier decision in *Huntly* correctly recited the common-law offense of going armed. *See id.* at 8 (collecting cases that regard *Huntly* as correctly decided).

agrees with the District that both the "why" and the "how" of these historical analogues are relevantly similar to the "why" and "how" of the District's weapons-offense bar. Accordingly, the court concludes that the District's application of the weapons-offense bar to Mr. Dotson is consistent with the historical tradition of firearm regulation.

Beginning with the "why," the drafters of the permanent weapons-offense bar intended to preclude people whose weapons offenses are "so serious as to indicate a permanent disability to safely and lawfully handle firearms." *Firearms Control Regulations Act of 1975: Hearing and Disposition on H.R. 694 Before the H. Comm. on the District of Columbia*, 94th Cong. 23 (1976) (report of David A. Clarke, Chairperson, Comm. on the Judiciary and Crim. Law) ("Report on H.R. 694"). The weapons-offense bar thus reflects the legislature's determination that people who have misused lethal weapons in certain ways pose an increased risk of misusing them again—much like the "surety laws . . . targeted the misuse of firearms" and the going armed laws prevented armed individuals from disrupting public order. *Rahimi*, 602 U.S. at 696-98.[12] And, Mr. Dotson's conduct confirms that the District's application of the weapons-offense bar against him is consistent with the rationale for the surety and going armed laws.

---

[12] While empirical evidence is unnecessary to support the District's justification, one of the District's experts explains that, according to a recent study, "when compared to people with no criminal history and controlling for all [other] variables to isolate the impacts of the exposure variable, those with a history of only weapons offenses were at . . . 3.6 times greater risk to be arrested for a violent firearm-related offense" in the future. ECF No. 25-13, at 13 ¶ 21. Contrary to Mr. Dotson's suggestion, the District's use of empirical evidence does not mark a return to the means-end scrutiny that *Bruen* now forbids. *See* ECF No. 29, at 25. Rather, the court takes the District's point to be that when a government "identifies" certain "'abuse[s]' of the right" to bear arms, "it can respond with 'focused regulations' to address the threat." *Wolford*, 609 U.S. at 220 (Barrett, J., concurring) (alteration in original) (first quoting W. Rawle, View of the Constitution of the United States of America 123 (1825); then quoting *Rahimi*, 602 U.S. at 700). Empirical evidence is one way a government might decide that a particular "abuse" is present.

Mr. Dotson was the front-row passenger in a car that was speeding and swerving on a highway regulated by the federal government. Nov. 16, 2016 Sentencing Hr'g at 11:36:48-11:39:08. When officers conducted a traffic stop, they observed him leaning from the front-row passenger seat toward the driver's seat for ten to fifteen seconds. *Id.* The officers later recovered the loaded handgun, which Mr. Dotson was convicted of possessing, from beneath the driver's seat, along with a large-capacity magazine. *Id.* Officers then searched Mr. Dotson and found that he was carrying marijuana. *Id.* Riding in a car that is speeding and swerving on the highway while simultaneously carrying a loaded firearm and possessing a controlled substance "disrupt[s] the 'public order.'" *Rahimi*, 602 U.S. at 697 (quoting *Huntly*, 25 N.C. at 421); *see* Nov. 16, 2016 Sentencing Hr'g at 11:36:48-11:39:08.[13] The loaded firearm in a vehicle that was traveling on public roads (and violating traffic laws in a way that put others in danger) increased the risk of any accident or altercation that might occur following a collision or unexpected movement. The danger Mr. Dotson posed is underscored by his effort to hide his firearm underneath the driver's seat as police officers approached the car. *See* Nov. 16, 2016 Sentencing Hr'g at 11:45:55-11:46:10. Not only does this conduct reflect Mr. Dotson's culpability for the federal crime he committed, but it also shows his intent to disregard firearms safety regulations that the District has promulgated. In short, Mr. Dotson flagrantly misused a firearm in a dangerous manner, and he did so while on probation for an earlier weapons offense. *Id.* at 11:39:15-40:30.

---

[13] Mr. Dotson maintains that Maryland's "permitting process" was unconstitutional at the time he committed this weapons offense, and he asks the court to judicially notice the statute that was similar to the New York law that the *Bruen* Court struck down. ECF No. 29, at 20. The court denies that request because Mr. Dotson's view of how Maryland law's fared under *Bruen* is irrelevant. What matters is that Mr. Dotson committed his predicate crime—the weapons offense in Maryland while on probation a prior weapons offense in the District of Columbia—in a manner that shows he poses a special risk of firearm misuse.

Short of police intervention—which resulted in Mr. Dotson's arrest—violence or another danger to the public was reasonably likely to ensue. At a minimum, Mr. Dotson's conduct endangered the police officers who approached the car after conducting the traffic stop. *See Barnes v. Felix*, 605 U.S. 73, 84-85 (2025) (Kavanaugh, J., concurring) (explaining that "[t]raffic stops remain highly dangerous today" and even those for "routine traffic violations" are "'fraught with danger to police officers'" (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983))).

Indeed, courts routinely observe that conduct like Mr. Dotson's poses a danger. *See Hemani*, 608 U.S. at 782 ("We appreciate that drugs and guns can sometimes make for a dangerous mix."); *Smith v. United States*, 508 U.S. 223, 227, 240 (1993) (explaining that when Congress enacted the then-current version of a law that imposed a mandatory minimum for possession of a firearm "'during and in relation to any . . . drug trafficking crime,'" it "was no doubt aware that drugs and guns are a dangerous combination" (quoting 18 U.S.C. § 924(c)(1))); *United States v. Blackson*, No. 23-CR-25, 2023 WL 1778194, at *7 (D.D.C. Feb. 6, 2023) (collecting cases that describe the dangers inherent in unlawfully possessing a loaded firearm); *cf. United States v. Dorsey*, 105 F.4th 526, 532 (3d Cir. 2024) (noting on plain-error review that the "[f]ailure to comply with a state firearm law is at least arguably dangerous"). To be sure, possessing drugs and firearms at the same time does not always create a danger to others. The *Hemani* Court therefore upheld a Second Amendment challenge to a Section 922(g)(3) prosecution of someone who used marijuana "a few times a week" based *only* on the claim that "anyone who regularly uses marijuana is categorically violent and dangerous without any further showing." 608 U.S. at 793. Here, however, Mr. Dotson's combined possession of a loaded firearm in a moving car, apparent attempt to hide the firearm from the police, possession of a large-capacity magazine, and possession of a

controlled substance create the type of danger and threat that motivated the historical surety and going armed laws.

Mr. Dotson first attempts to limit the rationale of surety and going armed laws to only those cases involving the "threat[] of physical harm." ECF No. 22-3, at 34. He quotes the *Rahimi* Court's observation that "[l]ike surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another." 602 U.S. at 698; ECF No. 22, at 32. That may be one discernible principle supported by both analogues, but the Court expressly cautioned that it had not "undertake[n] an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Rahimi*, 602 U.S. at 702 (second alteration in original) (quoting *Bruen*, 597 U.S. at 31); *see United States v. Jackson*, 138 F.4th 1244, 1255 (10th Cir. 2025) ("Nothing about [*Rahimi*'s] holding suggests only those posing an immediate threat may be disarmed."). The Court's conclusion that the surety and going armed laws had one application that supported one modern regulation does not mean that other applications of the same analogues cannot support the District's weapons-offense bar. Elsewhere in *Rahimi*, the Court acknowledged that "surety laws also targeted the misuse of firearms," and cited a Massachusetts law allowing for the arrest of any person who went armed offensively. 602 U.S. at 696. And the "thread [that] runs through" the going armed statutes is that "[t]hey prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. Surety and going armed laws reach the *threat* of violence, danger, or a breach of the peace. And the threat of violence, danger, or breach of peace can be directed at the public generally, rather than a specific victim like in the domestic violence context.

In any event, Mr. Dotson's theory has even less purchase because courts have pointed to founding-era statutes that prohibited riding while armed in fairs or markets but did not require a

defendant to have caused any terror. *Antonyuk*, 120 F.4th at 1039 (noting that "the district court failed to appreciate that the Founding-era North Carolina statute prohibited firearms in fairs and markets with no reference to terroristic conduct"); *see Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 292 n.66 (N.D.N.Y. 2022) (describing the 1786 Virginia law that mentioned "terror," but also a North Carolina law from 1792 and a Tennessee law from the Reconstruction era that did not), *aff'd in part*, *rev'd in part sub. nom. Anontyuk*, 120 F.4th 941. The statutes prohibiting merely riding armed in certain places without a reference to the terror a person might cause are consistent with the English practice dating back to the 1328 Statute of Northampton, which "provided that, with some exceptions, Englishmen could not . . . 'go nor ride armed by night nor by day, in Fairs[] [or] Markets.'" *Bruen*, 597 U.S. at 40 (quoting Statute of Northampton 1328, 2 Edw. 3 c. 3 (Eng.)). Mr. Dotson otherwise agrees that sureties could be imposed against "people likely to endanger the public" and that going armed laws "focused on dangerous, threatening behavior," ECF No. 22-3, at 32-34, but he attempts to distinguish his conduct from the justification for those laws, *id.* at 32-34; ECF No. 29, at 18, 28-29. In attempting to do so, Mr. Dotson fails to grasp that his own conduct clears that bar. In short, the rationales for surety and going armed laws and the weapons-offense bar are relevantly similar.

The comparative burdens imposed by the historical analogues and the District's regulation as applied to Mr. Dotson are also relevantly similar. The *Rahimi* Court concluded that the "going armed laws provided for imprisonment," which justifies the "the lesser restriction of temporary disarmament" imposed by Section 922(g)(8)'s prohibition on possession by a person subject to a qualifying domestic violence restraining order. 602 U.S. at 699. At first blush, this case presents a closer question than *Rahimi*—at least on the "how" inquiry—because it appears that Mr. Dotson will always be unable to register for a firearm in the District, *see* ECF No. 22-3, at 33-34; ECF

No. 32, at 32, which is a more severe restriction on the right to bear arms than he would face under Section 922(g)(8).[14] But here, the difference between how surety and going armed laws operated and how the weapons-offense bar works can be explained by the pre-deprivation process that Mr. Dotson received. *See Hemani*, 608 U.S. at 791 n.6 (explaining that unlike the prohibition on firearm possession for people under a qualifying domestic violence restraining order, some permanent prohibitions on firearm possession like the ban for people convicted of felony offenses "involve some manner of pre-deprivation process" and "[f]or that reason . . . 'nothing in [the Court's] opinion should be taken to cast doubt' on [it]" (quoting *Heller*, 554 U.S. at 626)). The weapons-offense bar did not apply to Mr. Dotson until he received a full criminal trial before a magistrate judge who found that he committed the weapons offense beyond a reasonable doubt. *See* Aug. 10, 2016 Docket Entry, *Dotson*, No. 15-MJ-1689; Nov. 16, 2016 Docket Entry, *Dotson*, No. 15-MJ-1689.

Mr. Dotson resists this conclusion, arguing that the surety and going armed laws and the weapons-offense bar impose dissimilar burdens beyond their temporal differences. ECF No. 22-3,

---

[14] In this way, the District's weapons-offense ban applies to Mr. Doston in a manner similar to Section 922(g)(9)'s prohibition on firearm possession for those with a prior conviction for a misdemeanor crime of domestic violence—a prohibition that applies unless and until the conviction is expunged or set aside or the individual receives a pardon. Several federal appellate courts have therefore explained that Section 922(g)(9) imposes a "permanent ban," even though that "may not always be so" because of the ability to seek a pardon or other type of post-conviction relief. *Gailes*, 118 F.4th at 829; *see, e.g.*, *United States v. Minor*, 165 F.4th 616, 624-25 (1st Cir. 2026) (noting that the possibility of civil rights restoration means that Section 922(g)(9)'s prohibition is not permanent); *United States v. Simmons*, 150 F.4th 126, 134 (2d Cir. 2025) (same); *United States v. Nutter*, 137 F.4th 224, 232 (4th Cir. 2025) (same); *United States v. Bernard*, 136 F.4th 762, 765-66 (8th Cir. 2025) (same); *Jackson*, 138 F.4th at 1254 (citing *Gailes* and characterizing the Section 922(g)(9) prohibition as "conditional" rather than "permanent"). The parties have not briefed whether Mr. Doston may seek expungement or a pardon for his federal firearms conviction in Maryland, so it remains an open question whether application of the District's weapons-offense bar as it applies to him is "conditional" or "permanent."

at 33; ECF No. 29, at 18. He highlights the fact that neither historical analogue resulted in permanent disarmament, as he claims the weapons-offense bar does to him. ECF No. 22-3, at 33-34. Yet Mr. Dotson does not contend with the pre-deprivation process he received, which the *Hemani* Court suggested puts some firearm prohibitions on stronger footing. 608 U.S. at 791 & n.6; *see generally* ECF No. 40. What is more, the District need only show a "historical analogue," not a "historical *twin*." *Rahimi*, 602 U.S. at 701 (quoting *Bruen*, 597 U.S. at 30). The surety and going armed laws "satisfy that condition because they imposed serious penalties, such as imprisonment, only after judicial determinations." *Allred*, 182 F.4th at 453 (concluding that Section 922(g)(9)'s "indefinite[]" prohibition was within the historical tradition embodied by the surety and going armed laws even though the latter "only led to temporary restrictions on rights").

Next, Mr. Dotson points to the "individualized judicial assessment" that a magistrate would complete before demanding a surety. ECF No. 22-3, at 33. He additionally emphasizes that surety laws did not "disarm persons able to provide surety." *Id.* These differences are well taken, but they do not alter the court's analysis. Mr. Dotson's focus on the individualized assessment that preceded a surety of the peace is misplaced because he ignores the process he received. The magistrate judge presiding over Mr. Dotson's criminal trial conducted an individualized, pre-deprivation assessment when he concluded that the United States had proven beyond a reasonable doubt that Mr. Dotson had committed a weapons offense alongside a drug possession offense—and that the government had met its burden based on testimony showing Mr. Dotson's dangerous conduct. *Cf. Allred*, 182 F.4th at 454 (explaining that the plaintiff's underlying criminal "conduct closely resemble[d]" the types of intentionally dangerous conduct covered by the surety and going armed laws). Nor does Mr. Dotson's emphasis on the lack of forfeiture for those who paid a surety bond fare better. ECF No. 29, at 17-18. Justice Thomas, the sole dissenter in *Rahimi*,

argued that "a surety demand did not alter an individual's right to keep and bear arms" because a person providing surety "kept possession of all his firearms; could purchase additional firearms; and could carry firearms in public and private." 602 U.S. at 764 (Thomas, J., dissenting). Additionally, a person who breached the peace only "had to pay a sum of money." *Id.* But the eight Justices in the *Rahimi* majority rejected that argument and considered surety and going armed laws together, concluding that the latter's allowance of imprisonment supported the "the lesser restriction of temporary disarmament." *Id.* at 698-99 (majority op.). At bottom, none of the responses raised by Mr. Dotson undermine the court's conclusion that applying the weapons-offense bar to him is consistent with the historical tradition of the surety and going armed laws.

ii. Disarmament as punishment for criminal violations or due to the risk of danger

*Historical analogues.* The District next points to various analogues that it believes demonstrate a history and tradition of disarming people who have been convicted of crimes or who, as a class, pose a risk of danger. First, the District explains that, in the founding era, a person convicted of a felony—including for certain non-violent offenses—could be required to forfeit his entire estate and sentenced to death. ECF No. 25, at 35. Some of the founding-era laws "covered all the felon's property—including firearms." *Richardson*, 2026 WL 2451537, at *4 (surveying founding-era statutes that required forfeiture for crimes ranging from counterfeiting, embezzlement, and "anti-competitive practices," to robbery, burglary, and treason); *see United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024) (explaining that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property" and collecting statutes); *Moore*, 111 F.4th at 270-71 (citing statutes in Pennsylvania, Massachusetts, and Virginia

requiring forfeiture of all property while serving a criminal sentence). These statutory provisions are consistent with the "highly influential" proposal for the Second Amendment offered by Pennsylvania at the ratification convention. ECF No. 25, at 36 (quoting *Heller*, 554 U.S. at 604). Under that proposal, the Second Amendment would have "guaranteed the right to arms 'unless for crimes committed, or real danger of public injury from individuals.'" *Id.* (quoting *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting)).

Second, the District contends that this tradition extended beyond felonies, relying on founding-era or post-ratification statutes that required a person to forfeit his firearm if he violated hunting laws. North Carolina and New Jersey "restricted who could hunt or enter private lands with a gun, and violators forfeited their guns." *Id.* at 35; *see* ECF No. 25-15, at 6 ¶ 15; *see also Jackson*, 110 F.4th at 1127 (citing a statute from 1652 in the colony of New Netherland and North Carolina's pre-ratification law). In North Carolina, no one owning less than one-hundred acres of land (except for "slave masters and overseers") could hunt deer, and anyone who violated the law incurred a fine and forfeited his gun. ECF No. 25-15, at 6 ¶ 15; *see* A Manual of the Laws of North Carolina 178 (John Haywood ed., 1801). In New Jersey, the legislature found laws prohibiting trespass with firearms to be ineffective at preventing unlawful hunting, so lawmakers revised the law in 1771 to ban individuals from carrying a firearm on another person's land "without written permission from the owner"; any "non-residents of the colony caught hunting for deer with a gun on lands they did not own" would forfeit their firearms. ECF No. 25-15, at 6 ¶ 15; *see* Laws of the State of New Jersey 20 (William Patterson ed., 1800). As Justice Barrett explained in *Wolford*, in a concurrence joined by Justices Thomas and Gorsuch, legislators in the 18th century passed laws prohibiting people from carrying firearms to hunt on other people's land out of concern for "significant damage to property" due to illegal hunting *and* because "fellow

hunters and innocent bystanders were often put in harm's way." 146 S. Ct. at 218 (Barrett, J., concurring); *see id.* at 217-19 (citing examples in Pennsylvania, New York, and South Carolina). "By requiring hunters to obtain permission before carrying firearms onto another's property," legislatures created a "default rule rather than a flat prohibition," "confined [the rule] to places where poaching was likely to occur," and "aimed to minimize the risk of incidental harm to persons and property." *Id.* at 218-19.

Finally, in the District's view, historical evidence demonstrates that a government could "disarm[] classes of people that [it] deemed dangerous or to have demonstrated disrespect for the law." ECF No. 25, at 37; *see Williams*, 113 F.4th at 657 (surveying colonial and founding-era examples supporting the conclusion that "governments labeled whole classes as presumptively dangerous"). Colonial legislatures "confiscated guns held by those who refused to join military associations, refused to declare an oath, were suspected of planning a rebellion, or were generally 'unfriendly to the views of Congress.'" ECF No. 25, at 36 (quoting ECF No. 25-15, at 8-9 ¶ 17); *see* ECF No. 25-15, at 8-9 ¶ 17 (explaining that in 1775, Baltimore's town committee sent representatives to confiscate firearms from two men who were planning a rebellion, and that a year later, George Washington ordered individuals in Long Island to be disarmed because they were suspected of having views that contradicted Congress's); *Jackson*, 110 F.4th at 1126 ("In the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty."). And, "English and colonial American governments also enacted other types of categorical bans on the possession of firearms by those who refused to follow less formal legal norms," ECF No. 25, at 36 (quoting *Hunt*, 123 F.4th at 706)—laws that the Fourth Circuit has observed covered "non-Anglican Protestants who refused to participate in

the Church of England," *Hunt*, 123 F.4th at 706 (quoting *Jackson*, 110 F.4th at 1126); *see Jackson*, 110 F.4th at 1126-27 (collecting evidence showing that "[r]eligious minorities" in Maryland, Virginia, and Pennsylvania "were subject to disarmament"). Other statutes prohibited "Native Americans" from possessing firearms. ECF No. 25, at 37; *Jackson*, 110 F.4th at 1126 (citing colonial laws prohibiting Native Americans from owning firearms); *Williams*, 113 F.4th at 652-53 (same).[15]

*Comparing the "why" and the "how."* Two principles could be drawn from these analogues. The first, advanced by the District, is broader: "the government could disarm individuals who failed to abide by legal norms." ECF No. 25, at 35. Another way to understand the historical evidence, including the consequences attending a felony conviction and the tradition of firearm forfeiture for violating hunting laws, is that the government can disarm a person who presents "a danger of [firearm] misuse" because he has "deviated from legal norms." *Jackson*, 110 F.4th at 1127. The court concludes that both the broader and narrower principles are consistent with the historical record and that the analogues supporting those principles are relevantly similar to the District's application of the weapons-offense bar to Mr. Dotson.

The first theory finds support from the D.C. Circuit's conclusion in *Medina* that disarming someone convicted of nearly any felony fits within the historical tradition of firearm regulation, although the Court reserved the question whether those who commit sufficiently "minor or regulatory" crimes do not forfeit their Second Amendment rights. 913 F.3d at 158, 160; *see supra*

---

[15] The District also cites evidence, as documented by one of its expert's historians, that legislatures in the founding era passed laws prohibiting enslaved people from carrying a gun and requiring forfeiture for any violation. ECF No. 25, at 37; *see* ECF No. 25-15, at 6 ¶ 15. The court declines to rely on these examples in light of the Supreme Court's treatment of a statute from Louisiana's Black Code in *Wolford*. *See* 609 U.S. at 211-12; *id.* at 221-25 (Barrett, J., concurring).

pp. 17-18 (concluding that *Medina* remains good law). Because the consequence of a felony conviction in the founding era could include estate forfeiture and the death penalty, these "greater punishments . . . 'subsumed disarmament,'" the punishment imposed by Section 922(g)(1). *Hunt*, 123 F.4th at 706 (quoting *Jackson*, 110 F.4th at 1127). The Supreme Court endorsed a similar greater-includes-the-lesser logic in *Rahimi*, when it concluded that imprisonment for violating the going armed laws permitted Section 922(g)(8)'s "lesser restriction of temporary disarmament." 602 U.S. at 699;[16] *cf. Richardson*, 2026 WL 2451537, at *6 (relying on *Rahimi*'s reasoning to reject a challenge to Section 922(g)(1) as applied to someone still serving a felony sentence). Several federal appellate courts that have considered as-applied challenges to the federal felon-in-possession statute after *Bruen* have upheld the law and deemed similar historical evidence persuasive. *See, e.g.*, *Zherka*, 140 F.4th at 83 (noting that the historical evidence supports Section 922(g)(1)'s constitutionality but is not "conclusive"); *Diaz*, 116 F.4th at 467-71 (considering the evidence dispositive); *Jackson*, 110 F.4th at 1125-29 (explaining that the law was constitutional under either principle); *Duarte*, 137 F.4th at 755-59 (concluding that the historical punishments for felonies supported Section 922(g)(1)); *cf. Hunt*, 123 F.4th at 702-08 (rejecting an as-applied challenge on other grounds but concluding that if the Court had reached *Bruen*'s second step, the law was constitutional under either principle).

On this view, the "why" and "how" of historical felony punishments are relevantly similar to the District's application of the weapons-offense bar to Mr. Dotson. "The purpose of capital punishment in colonial America was threefold: deterrence, retribution, and penitence." *Duarte*,

[16] As the court has explained, *see supra* pp. 32-34 & n.14, the *Rahimi* Court's focus on the temporary nature of the burden does not make the surety and going armed laws inapposite to the weapons-offense bar.

137 F.4th at 757 (quoting *Diaz*, 116 F.4th at 469). Those legislators who drafted the version of the weapons-offense bar that permanently disarms a person with a qualifying conviction expressly rejected the MPD Chief of Police's view the weapons offenders "should [not] be treated the same as persons convicted or indicted for felony crimes of violence." Report on H.R. 694, at 55. While the D.C. Council focused primarily on the danger posed by misuse of firearms, *see id.* at 24-26, 29-30, its view that those with qualifying weapons-offense convictions have committed felony-equivalent offenses means that the District's regulation shares the "why" of the historical felony punishments.

That rationale is apparent in this case. Although Mr. Dotson was convicted of a misdemeanor offense for possession of a handgun, the District correctly explains that the conduct underlying his conviction would have violated Maryland's law prohibiting possession of a firearm without a permit or license, which is a felony. ECF No. 25, at 21. The federal regulation supporting Mr. Dotson's conviction cannot be applied if "[t]he possession of the firearm is in compliance with the law of the State in which the National Park System unit is located." 36 C.F.R. § 2.4(a)(2). And, Maryland law permitted the "wearing, carrying, or transporting of a handgun" if Mr. Dotson had a "permit" allowing him to do so. Md. Code Ann., Crim. L. § 4-203(b)(2). Had Mr. Dotson been arrested miles north on a Maryland road rather than in a "National Park System" that is "located" in Maryland, 36 C.F.R. § 2.4(a)(2), he could have been convicted of a felony with a maximum penalty of three years in prison, Md. Code Ann., Crim. L. § 4-203(c)(2)(i)—for the exact same conduct. Such a conviction would have also subjected Mr. Dotson to Section 922(g)(1)'s lifetime prohibition on firearm possession because the offense would have been "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). The same would have been true if Mr. Dotson had been arrested a few miles west, inside the District of Columbia, which prohibits the carrying of a

pistol—here, a handgun—without a license and provides for a maximum penalty of five years of imprisonment. D.C. Code § 22-4504(a)(1) (2015); *see id.* § 22-4501(6) (giving "pistol" the same meaning as provided in D.C. Code § 7-2501.01(12)); *id.* § 7-2501.01(12) (defining "pistol" to mean "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length").

The court rejects the premise that the Second Amendment treats Mr. Dotson's conduct differently because he committed his predicate offense on a nine-mile stretch of highway policed by the U.S. Park Police rather than on a nearby road in Maryland or the District. Indeed, the "Second Amendment has the same meaning in all parts of the United States." *Wolford*, 609 U.S. at 206. Accordingly, the court finds that the logic of *Medina*—as well the post-*Bruen* Section 922(g)(1) cases from the Second, Fifth, Sixth, Eighth, and Ninth Circuits—together support the conclusion that the historical punishments for convicted felons are relevantly similar to the rationale for and burden imposed by the District's application of the weapons-offense bar to Mr. Dotson.

In reaching that conclusion, the court again underscores that this as-applied challenge presents a narrow question based only on Mr. Dotson's prior conviction and sentence. The court does not consider whether the weapons-offense bar can be constitutionally applied to other individuals with distinguishable criminal records. For that reason, Mr. Dotson's repeated insistence that the District's regulation is "overbroad" misses the mark. ECF No. 22-3, at 18, 34, 39-40, 42. The same is true of Mr. Dotson's assertion that misdemeanors are categorically dissimilar to felonies, ECF No. 29, at 29-30, and that his misdemeanor conviction is non-violent, ECF No. 22-3, at 25-30; ECF No. 29, at 11-12. The court considers only the weapons-offense bar as applied to Mr. Dotson in light of his specific criminal conviction. The issue here is whether the District may prohibit a person from registering a firearm when that person's prior weapons-offense conviction is

for conduct that unquestionably would have been a felony offense in the District or in Maryland. Mr. Dotson's arguments distinguishing misdemeanors from felonies and his characterization of the underlying conviction as a "simple possessory . . . offense," ECF No. 22-3, at 37, may have more purchase in another case with a different record. But they are unpersuasive given the conduct found by the magistrate judge to support Mr. Dotson's guilt and sentence.

Even if the broader principle advanced by the District did not support applying the weapons-offense bar to Mr. Dotson, the narrower one—premised on the legislature's ability to disarm a person whose failure to follow the law suggests he presents a danger of firearms misuse—does. The court considers this stricter principle out of its obligation "not to read a [historical] principle at such a high level of generality that it waters down the [Second Amendment] right." *Rahimi*, 602 U.S. at 740 (Barrett, J., concurring). It is sufficient to decide this case on the narrower ground. Taken together, the tradition of class-wide disarmament based on perceived danger, the influential Pennsylvania ratifying convention proposal, and historical antipoaching laws confirm that when a person's dangerous conduct underlying his criminal conviction indicates a specific risk of firearms misuse, he may be disarmed.

As the Fourth and Eighth Circuit have acknowledged, one "school[] of thought on the basis" for felon disarmament is the "legislature's traditional authority . . . to prohibit[] possession of firearms by those who are deemed more dangerous than a typical law-abiding citizen." *Jackson*, 110 F.4th at 1126; *see Hunt*, 123 F.4th at 706-08. Both courts concluded that the danger-specific principle for felon-in-possession laws is supported by the class-based prohibitions that the District has offered here, including the colonial-era laws disarming Native Americans, religious minorities, and people who refused to declare an oath of loyalty. *Jackson*, 110 F.4th at 1126-29; *Hunt*, 123 F.4th at 707-08. The relevant "danger" that these laws targeted was "of [firearm] misuse by those

who deviated from legal norms, not merely to address a person's demonstrated propensity for violence." *Jackson*, 110 F.4th at 1127. Then-Judge Barrett similarly concluded—based on class-wide disarmament of people perceived to be dangerous, as well as various proposals at state constitutional conventions—that the government may apply felon-in-possession laws to those it "deems dangerous," and "it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting); *see id.* at 455-56 (arguing that the better way to read the Pennsylvania ratifying convention proposal is that it would have prohibited firearm possession by those who posed a "real danger of public injury").

This principle is also consistent with the one drawn from historical hunting statutes prohibiting people from using firearms to hunt on another's property without permission. In *Wolford*, Justice Barrett, writing for herself, Justice Thomas, and Justice Gorsuch, explained that the historical "antipoaching laws support the principle that when a State identifies specific *places*" ripe for abuse of the Second Amendment right, it "can respond with 'focused regulations' to address the threat." 609 U.S. at 220 (emphasis added) (Barrett, J., concurring) (quoting *Rahimi*, 602 U.S. at 700). Five Justices on the Court therefore "agree[d]" that "'set[ting] the principle of [these] analogues at "poaching" is to demand a historical twin,'" *id.* at 220 n.5 (quoting *id.* at 248 (Jackson, J., dissenting)), which is more than *Bruen*'s history-and-tradition test requires, 597 U.S. at 30. To be sure, these Justices focused on a place-based principle supported by the antipoaching laws: "'focused regulations'" can target "specific places" in which firearms have posed a problem. *Wolford*, 609 U.S. at 220 (quoting *Rahimi*, 602 U.S. at 700); *see id.* at 249 (Jackson, J., dissenting). That makes sense given that the Hawaii law at issue in *Wolford* altered the default rules for firearm possession on private property open to the public. *Id.* at 198-201 (majority op.). But the same

antipoaching laws are also consistent with the principle that a government may issue targeted regulations to address an "equivalent risk" of firearm "misuse." *Id.* at 220 (Barrett, J., concurring); *see* ECF No. 39, at 7 n.2 (arguing that the early hunting laws are relevant to the weapons-offense bar based on *Wolford*). Courts routinely acknowledge that legislators may pass a statute for multiple purposes, *cf. Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013) ("[N]o legislation pursues its purposes at all costs." (alteration in original) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam))); *accord Martin v. United States*, 605 U.S. 395, 408 (2025) ("Members of Congress may well have had more than one purpose in mind[.]"), so it is unsurprising that a single historical analogue may stand for two closely related principles—so long as they are articulated at the appropriate level of generality.

Accordingly, the Pennsylvania ratifying convention proposal, the historical tradition of class-wide disarmament based on a legislature's perceived risk of dangerousness, and the antipoaching laws share relevantly similar justifications to the District's weapons-offense bar as applied to Mr. Dotson. The drafters of the 1975 version of the weapons-offense bar "felt that one violation" of the District's firearms regulations "was so serious as to indicate a permanent disability to safely and lawfully handle firearms." Report on H.R. 694, at 33. In other words, the drafters believed that a qualifying weapons-offense conviction demonstrated a person's "susceptibility . . . to use a[] firearm in a manner which would be dangerous to themselves or to other persons." *Id.* at 35

Mr. Dotson attempts to distinguish the rationale for the class-based prohibitions by asserting that the various analogues are "odious," ECF No. 22-3, at 34, 39, and would be constitutionally suspect today on equal protection or due process grounds, *id.* at 11-12, 20-25, 31 & n.9, 39. The court agrees that "[c]lassifying people as dangerous simply because of their race

or religion was wrong from the beginning and unconstitutional from 1868." *Williams*, 113 F.4th at 656. And the court has declined to consider evidence of laws prohibiting Black people from possessing firearms in the founding era. *See supra* n.15. Even if the remaining pre-Fourteenth Amendment laws concerning class-wide prohibitions based on perceived danger "reflect overgeneralized and abhorrent prejudices," *Duarte*, 137 F.4th at 760, they "provide insight into how early Americans conceived of the right to bear arms embodied in the Second Amendment," *Williams*, 113 F.4th at 656; *accord Jackson*, 110 F.4th at 1127; *Hunt*, 123 F.4th at 706-07. And none poses the same problem as Louisiana's Black Code did in *Wolford*. *See* 609 U.S. at 211-12; *id.* at 221-25 (Barrett, J., concurring). For example, colonial era legislatures disarmed Catholics "on the basis of allegiance, not on the basis of faith." *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007)). Likewise, early American legislatures disarmed Native Americans based on a perceived "threat[] to public safety and stability," and in the founding era, "many states even constitutionalized the disarmament" of "'distrusted' groups." *Id.* at 458. Put differently, the "'reason' justif[ying] the restriction" was predicated on assumed danger, which is relevantly similar to the "regulatory principle" underpinning the District's application of the weapons-offense to Mr. Dotson. *Wolford*, 609 U.S. at 224 n.10 (quoting *Rahimi*, 602 U.S. at 692).

Mr. Dotson's effort to distinguish the "why" of the antipoaching laws because they "relate[d] to hunting and game control" can be dispatched easily. ECF No. 22-3, at 39. By focusing only on hunting and poaching as the object of the regulation, Mr. Dotson transforms *Bruen*'s demand for a "well-established and representative historical *analogue*" into one for a "historical *twin*." 597 U.S. at 30. As five Justices in *Wolford* agreed, "conclud[ing] that a modern

law is not 'relevantly similar' if it addresses something other than hunting" is "too narrow." 609 U.S. at 220 & n.5 (Barrett, J., concurring); *see id.* at 247-48 (Jackson, J., dissenting). Mr. Dotson's limitation on the utility of historical hunting regulations would create "a law trapped in amber." *Rahimi*, 602 U.S. at 691.

The class-based prohibitions and the weapons-offense bar also share relevantly similar burdens. A minority at the Pennsylvania ratifying convention expressed the view that permanent disarmament was permissible if a person posed the requisite threat of danger. Although the minority proposal was not adopted, it was one of several that serves as "evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms." *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting). Other class-wide prohibitions "ke[pt] guns out of the hands of 'distrusted' groups" as "a matter of course." *Id.* at 458. These outright bans support the District's view that a permanent ban on firearm registration based on Mr. Dotson's demonstrated dangerous behavior and repeated misuse of firearms, *see supra* Section IV.B.2.b.i, is consistent with the historical tradition of firearm regulation.

The court agrees with Mr. Dotson that the antipoaching laws imposed a lesser burden than the weapons-offense bar's apparently permanent prohibition on firearm registration. Mr. Dotson points out that one New Jersey law only required a person to forfeit the firearms he used to hunt illegally. ECF No. 29, at 30. And many "legislatures confined the default rule" resulting in forfeiture "to places where poaching was rampant, while leaving individuals free to carry arms across other kinds of property." *Wolford*, 609 U.S. at 219 (Barrett, J., concurring). But the difference between the antipoaching laws and the weapons-offense bar on this one metric—the former's requirement of temporary forfeiture and the latter's apparently permanent ban on firearm registration—is not fatal to the District's regulation when both the historical analogue and

contemporary law otherwise target similar kinds of people, do so for similar purposes, and operate by prohibiting some form of firearm possession. *See Hemani*, 608 U.S. at 783 (rejecting the United States' history-and-tradition argument when the "habitual drunkard laws . . . differ[ed] dramatically from [Section] 922(g)(3)'s unlawful user provision on every single metric" and declining to "decide" "[w]hether any one of these problems taken in isolation would prove fatal to the government's cause"). And, as the court has explained with respect to the surety and going armed laws, the pre-deprivation process available before a weapons-offense conviction precludes a person from registering a firearm justifies some disparity in the type of burden the historical analogues and current regulation impose. *See supra* pp. 31-34 & n.14.

A similar argument to the one Mr. Dotson advances here was before the Court in *Rahimi*: Justice Thomas in dissent argued that the surety laws "shared a common justification with [Section] 922(g)(8)" but "imposed a materially different burden." 602 U.S. at 764 (Thomas, J., dissenting). The historical regulation "did not alter an individual's right to keep and bear arms" at all, whereas the latter "strips an individual of his Second Amendment right" by "complete[ly] ban[ning] . . . firearm ownership, possession, and use." *Id.* at 764, 766. The majority rejected that claim and concluded that the burdens between the analogue and challenged regulation were relevantly similar. *Id.* at 699 (majority op.).[17] The same is true here. Notwithstanding the temporal difference, the antipoaching laws are part of the regulatory tradition underpinning the weapons-offense bar. That is especially true because other historical analogues involving class-wide disarmament based on perceived danger imposed similar burdens. To demand

[17] To be sure, the *Rahimi* Court concluded that one way the two were relevantly similar is that both imposed temporary burdens. 602 U.S. at 699. As the court has explained, *see supra* Section IV.B.2.b.i, the surety laws and going armed laws together imposed a sufficiently similar burden to place the weapons-offense bar within the historical tradition of firearm regulation.

otherwise would "assume[] that founding-era legislatures maximally exercised their power to regulate" through antipoaching statutes. *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). Neither *Bruen* nor the Second Amendment demand such a "'use it or lose it' view of legislative authority." *Id.* at 740. In sum, the District's historical analogues place the weapons-offense bar within the American tradition of regulation targeting individuals whose unlawful conduct indicates they present a risk of misusing firearms.

Like the court cautioned after concluding that the historical punishments for felony offenses supported the weapons-offense bar, resolving Mr. Dotson's Second Amendment challenge does not require the court to confront the difficult questions that might surface in another case. "[A]ffording the government [the] 'broad power to designate any group as dangerous and thereby disqualify its members from having a gun' would risk allowing it to 'quickly swallow' the Second Amendment." *Hemani*, 608 U.S. at 793-94 (quoting *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting). That risk may surface in the District's other applications of its regulation. But this case does not pose the problem identified in *Hemani* because applying the weapons-offense bar to Mr. Dotson is consistent with the historical tradition of disarming those who have demonstrated a special risk of firearms misuse and those whom the legislature has deemed dangerous based on their unlawful conduct.

* * *

Taking together the "why" and "how" of both the historical analogues that the District has offered and its modern regulation on firearm registration, the weapons-offense bar may be applied to Mr. Dotson in a manner that is consistent with the Second Amendment. Each of the principles justifying the application of the weapons-offense bar against Mr. Dotson share a similar theme: the government may disarm an individual whose dangerous or criminal conduct poses a risk that

he will misuse firearms. Mr. Dotson's underlying federal criminal conviction—committed while Mr. Dotson was on probation for another weapons offense—fits within that tradition. The weapons-offense bar, at least for someone with Mr. Dotson's criminal record, does not "impose[] a substantial burden on public carry." *Bruen*, 597 U.S. at 50. It imposes no burden whatever on those who have safely exercised their Second Amendment rights in accordance with firearms regulations that Mr. Dotson does not challenge. In fact, the weapons-offense bar does not even preclude a person with certain types of weapons-offense convictions from registering a firearm. *See supra* Section I. It only prohibits Mr. Dotson from doing so because he violated the law by publicly misusing a firearm in a dangerous way while also disregarding the terms of his probation that were designed to keep himself and his community safe. The Second Amendment does not prevent the District from denying Mr. Dotson's application to register a firearm.

Although Mr. Dotson only sought partial summary judgment on his as-applied challenge, ECF No. 22-3, at 43; *see generally* ECF Nos. 22, 29, the court's conclusion that the District's weapons-offense bar is constitutional as applied to him dooms his facial challenge, *see United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act [requires a challenger to] establish that no set of circumstances exists under which the Act would be valid."). The court will therefore deny Mr. Dotson's partial motion for summary judgment and grant the District's cross-motion for summary judgment.

## V. CONCLUSION

For the foregoing reasons, the court will deny Plaintiff's Motion for Partial Summary Judgment, ECF No. 22, and grant Defendants' Cross-Motion for Summary Judgment, ECF No. 25. A contemporaneous order will issue.

LOREN L. ALIKHAN
United States District Judge

Date: September 30, 2026